## Case No. 16,151.

### UNITED STATES v. RHODES.

[Abb. U. S. 28; 1 Am. Law T. Rep. U. S. Cts. 22; 7 Am. Law Reg. (N. S.) 233.] [1]

Circuit Court, D. Kentucky. 1866.

INDICTMENT — CIVIL RIGHTS BILL — ITS CONSTITUTIONALITY.

1. An indictment need not aver the existence or the provisions of a public statute upon which the prosecution is founded.
[Cited in U. S. v. Goodwin, 20 Fed. 239.]

2. An indictment for burglary in entering the house of T. in Kentucky, averred that T. was of African descent, and a citizen; that she was, by the laws of Kentucky, denied the right to testify against the defendants, they being white. There was a public statute of Kentucky, enabling white persons under similar circumstances to testify. Held, that the indictment was sufficient, and that the circuit court might take jurisdiction under section 3 of the act of April 9, 1866, (14 Stat. 27) known as the "civil rights" bill, notwithstanding there was no averment of the statute of Kentucky. The circuit court should take judicial notice of such statute, and the indictment should be construed in the same manner as if the statute were averred.

3. A prosecution for burglary is "a cause affecting" the owner of the building entered, within the meaning of section 3 of the civil rights bill, giving the courts of the Union jurisdiction of all causes affecting persons who cannot enforce in the courts of the state any of the rights secured to them by the first section. If the owner of the building entered, is, on account of color, incompetent, by the law of the state where the offense is alleged to have been committed, to testify in support of the indictment as a white person might, the circuit court has jurisdiction.

4. The criminal jurisdiction conferred upon the circuit and district courts by section 3 of the civil rights bill, is not confined to offenses committed by colored persons. It extends to prosecutions against white persons for offenses affecting persons who cannot enforce in the state courts the rights secured to them by section 1.

5. The civil rights bill is not a penal statute. It is a remedial one, and is to be liberally construed.

6. The history of the adoption of the first thirteen amendments to the constitution, and the objects and proper construction of them, explained.

7. Free persons of color, born within the allegiance of the United States, are citizens; and have always been entitled to be so regarded.
[Cited in McKay v. Campbell, Case No. 8,840.]

8. The dicta to the contrary, in Scott v. Sanford, 19 How. [60 U. S.] 393, disapproved.

9. The emancipation of a native born slave, by the thirteenth amendment, removed the disability of slavery, and made him a citizen of the United States; subject, however, to any lawful restrictions imposed upon his right to vote, or other powers or privileges.
[Cited in Le Grand v. U. S., 12 Fed. 581; U. S. v. Harris, 106 U. S. 640, 1 Sup. Ct. 610.]

10. The act of April 9, 1866 (14 Stat. 27) known as the "civil rights" bill, is constitutional in all its provisions. It is an appropriate method of exercising the power conferred on congress by the thirteenth amendment.
[11. Cited in Re Bogart, Case No. 1,596, to the point that since the organization of the supreme court, but three acts of congress have been pronounced by that body void for unconstitutionality.]

Motion in arrest of judgment.

SWAYNE, Circuit Justice. This is a prosecution under the act of congress of the 9th of April, 1866 [14 Stat. 27], entitled "An act to protect all persons in the United States in their civil rights, and to furnish the means for their vindication." The defendants having been found guilty by a jury, the case is now before us upon a motion in arrest of judgment.

Three grounds are relied upon in support of the motion. It is insisted: I. That the indictment is fatally defective. II. That the case which it makes, or was intended to make, is not within the act of congress upon which it is founded. III. That the act itself is unconstitutional and void.

I. As to the indictment, if either count be sufficient, it will support the judgment of the court upon the verdict. Our attention will be confined to the second count. That count alleges that the defendants, being white persons, "on the 1st day of May, 1866, at the county of Nelson, in the state and district of Kentucky, at the hour of eleven of the clock in the night of the same day, feloniously and burglariously did break and enter the dwelling house there situate of Nancy Talbot, a citizen of the United States of the African race, having been born in the United States, and not subject to any foreign power, who was then and there, and is now, denied the right to testify against the said defendants, in the courts of the state of Kentucky, and of the said county of Nelson, with intent the goods and chattels, moneys and property of

[1] [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission. 1 Am. Law Reg. (N. S.) 233, contains only a partial report.]

the said Nancy Talbot, in the said dwelling house then and there being, feloniously and burglariously to steal, take, and carry away, contrary to the statute in such case made and provided, and against the peace and dignity of the United States."

The objection urged against this count is, that it does not aver that "white citizens" enjoy the right which it is alleged is denied to Nancy Talbot. This fact is vital in the case. Without it our jurisdiction cannot be maintained. It is averred that she is a citizen of the United States, of the African race, and that she is denied the right to testify against the defendants, they being white persons. Section 669 of the Code of Civil Practice of Kentucky gives this right to white persons under the same circumstances. This is a public statute, and we are bound to take judicial cognizance of it. It is never necessary to set forth matters of law in a criminal pleading. The indictment is, in legal effect, as if it averred the existence and provisions of the statute. The enjoyment of the right in question by white citizens is a conclusion of law from the facts stated. Averment and proof could not bring it into the case more effectually for any purpose than it is there already. 1 Chit. Cr. Law, 188; 2 Bos. & P. 127; 2 Leach, 942; 1 Bish. Cr. Proc. §§ 52, 53. This right is one of those secured to Nancy Talbot by the first section of this act. The objection to this count cannot be sustained.

II. Is the offense charged, within the statute? The first section enacts: — "That all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery," . . . . "shall have the same right in every state and territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, sell and convey real and personal property; and to full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

The second section provides:—"That any person, who under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any state or territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in the condition of slavery," . . . . "or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor," &c.

The third section declares:—"That the dis-

trict courts of the United States within their respective districts, shall have, exclusively of the courts of the several states, cognizance of all crimes and offenses committed against the provisions of this act, and also, concurrently with the circuit courts of the United States, of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the state where they may be, any of the rights secured to them by the first section of this act; and if any suit or prosecution, civil or criminal, shall be commenced in any state court against such person, for any cause whatsoever," . . . . . "such defendant shall have the right to remove such cause for trial to the proper district or circuit court in the manner prescribed by the act relating to habeas corpus, and regulating judicial proceedings in certain cases, approved March 3, 1863, and all acts amendatory thereof."

It will be observed that jurisdiction is given to this court "of all causes, civil and criminal," affecting persons who are denied or cannot enforce in the local state courts "any of the rights secured by the first section of this act." The denial of any one is as effectual as the denial of any other or of all. But it is said the cause set forth in the indictment is not one affecting Nancy Talbot, in the sense of the law, and that therefore this court has no jurisdiction. U. S. v. Ortega, 11 Wheat. [24 U. S.] 467, is relied upon as authority for this proposition. That case is as follows: The constitution provides (article 3, § 2) that—"In all cases affecting ambassadors, other public ministers and consuls and those in which a state shall be a party, the supreme court shall have original jurisdiction."

Ortega was indicted in the circuit court for "infracting the law of nations by offering violence to the person" of Salmon, the charge d'affaires of Spain in the United States. The judges of the circuit court were opposed in opinion upon two questions, which were thereupon certified to the supreme court. They were: (1) Whether the case was one affecting a public minister within the meaning of the constitution; (2) and whether in such cases the jurisdiction of the supreme court is exclusive.

The supreme court decided only the first question. It was held that the case did not affect the charge d'affaires. This rendered it unnecessary to decide the other question, and it is still unsettled. It will be observed that the language of the statute is different. It is "causes, civil and criminal," and not "cases."

Burrill, in his Law Dictionary, thus defines "cause": "The origin or foundation of a thing, as of a suit or action; a ground of action. 1 Const. 470." The phrase "causes, civil and criminal," must be understood in the sense of causes of civil action and causes of criminal prosecution. These do unquestionably affect the plaintiff in the one case,

and the party against whose person or property the crime is committed in the other.

The soundness and authority of the judgment in the case of Ortega are not questioned; but it is by no means true, as a universal proposition, that none are affected in the legal sense of the term, by a case, but those who are parties to the record. The solution of the question must always depend upon the circumstances.

In Osborn v. Bank of the United States, 9 Wheat. [22 U. S.] 584, the court said: "If a suit be brought against a foreign minister, the supreme court has original jurisdiction, and this is shown in the record; but suppose a suit be brought which affects the interests of a foreign minister, or by which his servant, or his secretary, becomes a party to the suit, but the actual defendant pleads to the jurisdiction and asserts his privilege. If the suit affects a foreign minister it must be dismissed; not because he is a party to it, but because it affects him."

It may be asked, what is—if this is not— the proper construction of the statute? It has been answered that none are affected in criminal cases but the sovereign prosecuting and the defendants; and that hence colored persons only can be prosecuted under its provisions. When the act was passed there was no state where ample provision did not exist for the trial and punishment of persons of color for all offenses; and no locality where there was any difficulty in enforcing the law against them. There was no complaint upon the subject. The aid of congress was not invoked in that direction. It is not denied that the first and second sections were designed solely for their benefit. The third section, giving the jurisdiction to which this question relates, provides expressly that if sued or prosecuted in a state court under the circumstances mentioned, they may at once have the cause certified into a proper federal court.

The fourth section requires district-attorneys, marshals and their deputies, commissioners, agents of the freedmen's bureau, and other officers specially empowered by the president, to institute proceedings at the expense of the United States, against all persons violating the provisions of the act; and "with a view to affording reasonable protection to all persons in their constitutional rights of equality before the law, without distinction of race or color, or previous condition of slavery or involuntary servitude," it is made the duty of circuit courts of the United States to increase the number of their commissioners.

The fifth section imposes a heavy fine on marshals who shall refuse to receive or neglect to execute any process issued under the act; and it authorizes commissioners to appoint persons to serve such process issued by them.

The sixth section renders liable to fine and imprisonment any person who shall obstruct an officer or other person in the execution of such process; or who shall aid a person arrested to escape; or conceal a person for whose arrest a warrant has been issued.

Section eight authorizes the president to direct the judge, marshal, and district-attorney to attend at such place and for such time as he may designate, "for the purpose of the more speedy arrest and trial of persons charged with violations of this act."

The ninth section authorizes the president to employ such part of the land and naval forces of the United States, and of the militia, as shall be necessary to "prevent the violation and enforce the due execution of this act."

It is incredible that all this machinery, including the agency of the freedmen's bureau, would have been provided, if the intention were to limit the criminal jurisdiction conferred by the third section to colored persons, and exclude all white persons from its operation.

The title of the act is in harmony with this view of the subject. The construction contended for would obviously defeat the main object which congress had in view in passing the act, and produce results the opposite of those intended.

The difficulty was that where a white man was sued by a colored man, or was prosecuted for a crime against a colored man, colored witnesses were excluded. This in many cases involved a denial of justice. Crimes of the deepest dye were committed by white men with impunity. Courts and juries were frequently hostile to the colored man, and administered justice, both civil and criminal, in a corresponding spirit. Congress met these evils by giving to the colored man everywhere the same right to testify "as is enjoyed by white citizens," abolishing the distinction between white and colored witnesses, and by giving to the courts of the United States jurisdiction of all causes, civil and criminal, which concern him, wherever the right to testify as if he were white is denied to him or cannot be enforced in the local tribunals of the state.

The context and the rules of interpretation to be applied permit of no other construction. Such was clearly the intention of congress, and that intention constitutes the law.

This, with the provision which authorizes colored defendants in the state courts to have their causes certified into the federal courts, and the other provisions referred to, renders the protection which congress has given as effectual as it can well be made by legislation. It is one system, all the parts looking to the same end.

Where crime is committed with impunity by any class of persons, society, so far as they are concerned, is reduced to that condition of barbarism which compels those unprotected by other sanctions to rely upon

physical force for the vindication of their natural rights. There is no other remedy, and no other security.

It is said there can be no such thing as a right to testify, and that if congress conferred it by this act, a cloud of colored witnesses may appear in every case and claim to exercise it. There is no force in this argument. The statute is to be construed reasonably. Like the right to sue and to contract, it is to be exercised only on proper occasions and within proper limits. Every right given is to be the same "as is enjoyed by white citizens."

It is urged that this is a penal statute, and to be construed strictly. We regard it as remedial in its character, and to be construed liberally, to carry out the wise and beneficent purposes of congress in enacting it. Bac. Abr. tit. "Statute," 1.

But if the act were a penal statute, the canons of interpretation to be applied would not affect the conclusion at which we have arrived. U. S. v. Wiltberger, 5 Wheat. [18 U. S.] 96; Com. v. Loring, 8 Pick. 374; U. S. v. Morris, 14 Pet. [39 U. S.] 475; U. S. v. Winn [Case No. 16,740]; 1 Bish. Cr. Law, 236. This objection to the indictment cannot avail the defendants.

III. Is the act warranted by the constitution? The first eleven amendments of the constitution were intended to limit the powers of the government which it created, and to protect the people of the states. Though earnestly sustained by the friends of the constitution, they originated in the hostile feelings with which it was regarded by a large portion of the people, and were shaped by the jealous policy which those feelings inspired. The enemies of the constitution saw many perils of evil in the center, but none elsewhere. They feared tyranny in the head, not anarchy in the members, and they took their measures accordingly. The friends of the constitution desired to obviate all just grounds of apprehension, and to give repose to the public mind. It was important to unite, as far as possible, the entire people in support of the new system which had been adopted. They felt the necessity of doing all in their power to remove every obstacle in the way of its success. The most momentous consequences for good or evil to the country were to follow the results of the experiment. Hence the spirit of concession which animated the convention, and hence the adoption of these amendments after the work of the convention was done and had been approved by the people. The twelfth amendment grew out of the contest between Jefferson and Burr for the presidency. The thirteenth amendment is the last one made. It trenches directly upon the power of the states and of the people of the states. It is the first and only instance of a change of this character in the organic law. It destroyed the most important relation between capital and labor in all the states where slavery existed. It affected deeply the fortunes of a large portion of their people. It struck out of existence millions of property. The measure was the consequence of a strife of opinions, and a conflict of interests, real or imaginary, as old as the constitution itself. These elements of discord grew in intensity. Their violence was increased by the throes and convulsions of a civil war. The impetuous vortex finally swallowed up the evil, and with it forever the power to restore it. Those who insisted upon the adoption of this amendment were animated by no spirit of vengeance. They sought security against the recurrence of a sectional conflict. They felt that much was due to the African race for the part it had borne during the war. They were also impelled by a sense of right and by a strong sense of justice to an unoffending and long-suffering people. These considerations must not be lost sight of when we come to examine the amendment in order to ascertain its proper construction.

The act of congress confers citizenship. Who are citizens, and what are their rights? The constitution uses the words "citizen" and "natural born citizens;" but neither that instrument nor any act of congress has attempted to define their meaning. British jurisprudence, whence so much of our own is drawn, throws little light upon the subject. In Johnson's Dictionary, "citizen" is thus defined: "(1) A freeman of a city; not a foreigner; not a slave; (2) a townsman, a man of trade; not a gentleman; (3) an inhabitant; a dweller in any place."

The definitions given by other English lexicographers are substantially the same. In Jacob's Law Dictionary (Ed. 1783), the only definition given is as follows: "Citizens (cives) of London are either freemen or such as reside and keep a family in the city, etc.; and some are citizens and freemen, and some are not, who have not so great privileges as others. The citizens of London may prescribe against a statute, because their liberties are reinforced by statute." 1 Rolle, 105.

Blackstone and Tomlin contain nothing upon the subject. "The word 'civis,' taken in the strictest sense, extends only to him that is entitled to the privileges of a city of which he is a member, and in that sense there is a distinction between a citizen and an inhabitant within the same city, for every inhabitant there is not a citizen." Scot v. Schwartz, Comyn, 677. "A citizen is a freeman who has kept a family in a city." Roy v. Hanger, 1 Rolle, 138, 149. "The term 'citizen,' as understood in our law, is precisely analogous to the term subject, in the common law; and the change of phrases has entirely resulted from the change of government. The sovereignty has been changed from one man to the collective body of the people, and he who before was a subject of

the king is now a citizen of the state." State v. Manuel, 4 Dev. & B. 26.

In Shanks v. Dupont, 3 Pet. [28 U. S.] 247, the supreme court of the United States said: "During the war each party claimed the allegiance of the natives of the colonies as due exclusively to itself. The Americans insisted upon the allegiance of all born within the states, respectively; and Great Britain asserted an equally exclusive claim. The treaty of 1783 acted upon the state of things as it existed at that period. It took the actual state of things as its basis. All those, whether natives or otherwise, who then adhered to the American states, were virtually absolved from their allegiance to the British crown, and those who then adhered to the British crown, were deemed and held subjects of that crown. The treaty of peace was a treaty operating between the states on each side, and the inhabitants thereof; in the language of the seventh article, it was a 'firm and perpetual peace between his Britannic majesty and the said states, and between the subjects of one and the citizens of the other.' Who then were subjects or citizens was to be decided by the state of facts. If they were originally subjects of Great Britain and then adhered to her and were claimed by her as subjects, the treaty deemed them such; if they were originally British subjects, but then adhering to the states, the treaty deemed them citizens."

All persons born in the allegiance of the king are natural born subjects, and all persons born in the allegiance of the United States are natural born citizens. Birth and allegiance go together. Such is the rule of the common law, and it is the common law of this country, as well as of England. There are two exceptions, and only two, to the universality of its application. The children of ambassadors are in theory born in the allegiance of the powers the ambassadors represent, and slaves, in legal contemplation, are property, and not persons. 2 Kent, Comm. 1; Calvin's Case, 7 Coke. 1; 1 Bl. Comm. 366; Lynch v. Clarke, 1 Sand. Ch. 583.

The common law has made no distinction on account of race or color. None is now made in England, nor in any other Christian country of Europe. The fourth of the Articles of Confederation declared that the "free inhabitants of each of these states, paupers, vagabonds, and fugitives from justice excepted, shall be entitled to all the privileges and immunities of free citizens in the United States," &c. On the 25th of June, 1778, when these articles were under consideration by the congress, South Carolina moved to amend this fourth article by inserting after the word "free" and before the word "inhabitants," the word "white." Two states voted for the amendment and eight against it. The vote of one was divided. Scott v. Sanford, 19 How. [60 U. S.] 575. When the constitution was adopted, free men of color were clothed with the franchise of voting in at least five states, and were a part of the people whose sanction breathed into it the breath of life. Scott v. Sanford, Id. 573; State v. Manuel, 2 Dev. & B. 24, 25.

" 'Citizens' under our constitution and laws means free inhabitants born within the United States or naturalized under the laws of congress." 1 Kent, Comm. 292, note. We find no warrant for the opinion that this great principle of the common law has ever been changed in the United States. It has always obtained here with the same vigor, and subject only to the same exceptions, since as before the Revolution.

It is further said in the note in 1 Kent, Comm., before referred to: "If a slave born in the United States be manumitted or otherwise lawfully discharged from bondage, or if a black man born in the United States becomes free, he becomes thenceforward a citizen, but under such disabilities as the laws of the several states may deem it expedient to prescribe to persons of color."

In the case of State v. Manuel, supra, it was remarked: "It has been said that by the constitution of the United States, the power of naturalization has been conferred exclusively upon congress, and therefore it cannot be competent for any state by its municipal regulations to make a citizen. But what is naturalization? It is the removal of the disabilities of alienage. Emancipation is the removal of the incapacity of slavery. The latter depends wholly upon the internal regulations of the state. The former belongs to the government of the United States. It would be dangerous to confound them." Id. p. 25.

This was a decision of the supreme court of North Carolina, made in the year 1836. The opinion was delivered by Judge Gaston. He was one of the most able and learned judges this country has produced. The same court, in 1848, Chief Justice Ruffin delivering the opinion, referred to the case of State v. Manuel, and said: "That case underwent a very laborious investigation by both the bench and the bar. The case was brought here by appeal, and was felt to be one of very great importance in principle. It was considered with an anxiety and care worthy of the principle involved, and which give it a controlling influence upon all questions of similar nature." State v. Newsom, 5 Ired. 253.

We cannot deny the assent of our judgment to the soundness of the proposition that the emancipation of a native born slave by removing the disability of slavery made him a citizen. If these views be correct, the provision in the act of congress conferring citizenship was unnecessary, and is inoperative. Granting this to be so, it was well, if congress had the power, to insert it, in order to prevent doubts and differences of opinion which might otherwise have existed upon the subject. We are aware that a majority of the

court, in the case of Scott v. Sanford, arrived at conclusions different from those we have expressed. But in our judgment these points were not before them. They decided that the whole case, including the agreed facts, was open to their examination, and that Scott was a slave. This central and controlling fact excluded all other questions, and what was said upon them by those of the majority, with whatever learning and ability the argument was conducted, is no more binding upon this court as authority than the views of the minority upon the same subjects. Carroll v. Carroll, 16 How. [57 U. S.] 287.

The fact that one is a subject or citizen determines nothing as to his rights as such. They vary in different localities and according to circumstances. Citizenship has no necessary connection with the franchise of voting, eligibility to office, or indeed with any other rights, civil or political. Women, minors, and persons non compos are citizens, and not the less so on account of their disabilities. In England, not to advert to the various local regulations, the new reform bill gives the right of voting for members of parliament to about eight hundred thousand persons from whom it was before withheld. There, the subject is wholly within the control of parliament. Here, until the thirteenth amendment was adopted, the power belonged entirely to the states, and they exercised it without question from any quarter, as absolutely as if they were not members of the Union.

The first ten amendments to the constitution, which are in the nature of a bill of rights, apply only to the national government. They were not intended to restrict the power of the states. Barrows v. Mayor, etc., 7 Pet. [32 U. S.] 247; Withers v. Buckley, 20 How. [61 U. S.] 84; Murphy v. People, 2 Cow. 818.

Our attention has been called to several treaties by which Indians were made citizens; to those by which Louisiana, Florida, and California were acquired, and to the act passed in relation to Texas. All this was done under the war and treaty making powers of the constitution, and those which authorize the national government to regulate the territory and other property of the United States, and to admit new states into the Union. American Ins. Co. v. Canter, 1 Pet. [26 U. S.] 511; Cross v. Harrison, 16 How. [57 U. S.] 164; 2 Story, Const. 158.

These powers are not involved in the question before us, and it is not necessary particularly to consider them. A few remarks, however, in this connection will not be out of place. A treaty is declared by the constitution to be the "law of the land." What is unwarranted or forbidden by the constitution can no more be done in one way than in another. The authority of the national government is limited, though supreme in the sphere of its operation. As compared with the state governments, the subjects upon which it operates are few in number. Its objects are all national. It is one wholly of delegated powers. The states possess all which they have not surrendered; the government of the Union only such as the constitution has given to it, expressly or incidentally, and by reasonable intendment. Whenever an act of that government is challenged a grant of power must be shown, or the act is void.

"The power to make colored persons citizens has been actually exercised in repeated and important instances. See the treaty with the Choctaws of September 27, 1830, art. 14; with the Cherokees of May 20, 1836, art. 12; and the treaty of Guadeloupe Hidalgo, of February 2, 1848, art. 8." Scott v. Sanford, 19 How. [60 U. S.] 486, opinion of Curtis, J.

See, also, the treaty with France of April 30, 1803, by which Louisiana was acquired (article 3); and the treaty with Spain of the 23rd of February, 1819, by which Florida was acquired (article 3). The article referred to in the treaty with France and in the treaty with Spain is in the same language. In both the phrase "inhabitants" is used. No discrimination is made against those, in whole or in part, of the African race. So in the treaty of Guadeloupe Hidalgo (articles 8 and 9), no reference is made to color.

Our attention has been called to three provisions of the constitution, besides the thirteenth amendment, each of which will be briefly adverted to.

1. Congress has power "to establish an uniform rule of naturalization." Article 1, § 8. After considerable fluctuations of judicial opinion, it was finally settled by the supreme court that this power is vested exclusively in congress. Collet v. Collet, 2 Dall. [2 U. S.] 294; U. S. v. Velati, Id. 370; Golden v. Prince [Case No. 5,509]; Chirac v. Chirac, 2 Wheat. [15 U. S.] 259; Houston v. Moore, Id. 49; Federalist, No. 32.

An alien naturalized is "to all intents and purposes a natural born subject." Co. Litt. 129. "Naturalization takes effect from birth; denization from the date of the patent." Vin. Abr. tit. "Alien," D. Until the passage of a late act of parliament, naturalization in England was effected by a special statute in each case. The statutes were usually alike. The form appears in Godfrey v. Dickson, Cro. Jac. 539, c. 7. Under the late act a resident alien may accomplish the object by a petition to the secretary of state for the home department.

The power is applicable only to those of foreign birth. Alienage is an indispensable element in the process. To make one of domestic birth a citizen is not naturalization, and cannot be brought within the exercise of that power. There is a universal agreement of opinion upon this subject. Scott v. Sanford, 19 How. [60 U. S.] 578; 2 Story, Const. 44.

In the exercise of this power congress has confined the law to white persons. No one

doubts their authority to extend it to all aliens, without regard to race or color. But they were not bound to do so. As in other cases, it was for them to determine the extent and the manner in which the power given should be exercised. They could not exceed it, but they were not bound to exhaust it. It was well remarked by one of the dissenting judges, in Scott v. Sanford, 19 How. [60 U. S.] 586, in regard to the African race:

"The constitution has not excluded them, and since that has conferred on congress the power to naturalize colored aliens, it certainly shows color is not a necessary qualification for citizenship under the constitution of the United States."

It may be added that before the adoption of the constitution, the states possessed the power of making both those of foreign and domestic birth citizens, according to their discretion. This power, as to the former, they surrendered. They did not as to the latter, and they still possess it.

"The powers not delegated to the United States by this constitution, nor prohibited by it to the states, are reserved to the states respectively or to the people." Const. Amend. What the several states under the original constitution only could have done, the nation has done by the thirteenth amendment. An occasion for the exercise of this power by the states may not, perhaps cannot, hereafter arise.

2. "The citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states." Const. art. 14, § 2. This provision of the constitution applies only to citizens going from one state to another. "It is obvious that if the citizens of each state were to be deemed aliens to each other, they could not take or hold real estate, or other privileges, except as other aliens." "The intention of this clause was to confer on them, as one may say, a general citizenship, and to communicate all the privileges and immunities which the citizens of the same state would be entitled to under the same circumstances." 2 Story, Const. § 187.

Chancellor Kent says: "If citizens remove from one state to another, they are entitled to the privileges that persons of the same description are entitled to in the states to which the removal is made, and to none other." 2 Kent, Comm. 36. This provision does not bear particularly upon the question before us, and need not be further considered.

3. "The United States shall guarantee to every state in this Union a republican form of government, and shall protect each of them against invasion, and on application of the legislature or of the executive (when the legislature cannot be convened), against domestic violence." Article 4, § 4.

Mr. Justice Story, adopting the language of the Federalist, says: "That but for this power a successful faction might erect a tyranny on the ruins of order and law, while no succor could be constitutionally afforded by the Union to the friends and supporters of the government." . . . "But a right implies a remedy, and where else could the remedy be deposited than where it is deposited by the constitution?" 2 Story, Const. 559, 560. This topic is foreign to the subject before us. We shall not pursue it further.

Congress, in passing the act under consideration, did not proceed upon this ground. It is not the theory or purpose of that act to apply the appropriate remedy for such a state of things. The constitutionality of the act cannot be sustained under this section.

This brings us to the examination of the thirteenth amendment. It is as follows:

"Article 13, § 1. Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction.

"Sec. 2. Congress shall have power to enforce this article by appropriate legislation."

Before the adoption of this amendment, the constitution, at the close of the enumeration of the powers of congress, authorized that body "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or any department or officer thereof."

In McCullough v. Maryland, 4 Wheat. [17 U. S.] 421–423, Chief Justice Marshall used the phrase "appropriate" as the equivalent and exponent of "necessary and proper" in the preceding paragraph. He said: "Let the end be legitimate, let it be within the scope of the constitution, and all the means which are appropriate, which are plainly adapted to the end, which are not prohibited, but consistent with the letter and spirit of the constitution, are constitutional." . . . . "To use one" (a bank) "must be within the discretion of congress, if it be an appropriate mode of executing the powers of government." . . . . "But were its necessity less apparent" (the Bank of the United States), "none can deny its being an appropriate measure; and if it is, the degree of its necessity, as has been justly observed, is to be discussed in another place."

Pursuing the subject, he added: "When the law is not prohibited, and is really calculated to effect any of the objects entrusted to the government, to undertake here to inquire into the degree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. This court disclaims all pretensions to such a power."

Judge Story says: "In the practical application of government, then, the public functionaries must be left at liberty to exercise the powers with which the people, by the

constitution and laws, have entrusted them. They must have a wide discretion as to the choice of means; and the only limitation upon the discretion would seem to be that the means are appropriate to the end; and this must admit of considerable latitude, for the relation between the action and the end, as has been justly remarked, is not always so direct and palpable as to strike the eye of every observer. If the end be legitimate, and within the scope of the constitution, all the means which are appropriate, and which are plainly adapted to that end, and which are not prohibited, may be constitutionally employed to carry it into effect." 1 Story, Const. § 432.

These passages show the spirit in which the amendment is to be interpreted, and develop fully the principles to be applied. Before proceeding further, it would be well to pause and direct our attention to what has been deemed appropriate in the execution of some of the other powers confided to congress in like general terms.

(1) "The power to lay and collect taxes, duties, and imposts." This includes authority to build custom houses; to employ revenue cutters; to appoint the necessary collectors and other officers; to take bonds for the performance of their duties; to establish the needful bureaus; to prescribe when, how, and in what the taxes and duties shall be paid; to rent or build warehouses for temporary storing purposes; to define all crimes relating to the subject in its various ramifications, with their punishment; and to provide for their prosecution.

(2) "To regulate commerce with foreign nations, among the several states, and with the Indian tribes." This carries with it the power to build and maintain lighthouses, piers, and breakwaters; to employ revenue cutters; to cause surveys to be made of coasts, rivers, and harbors; to appoint all necessary officers, at home and abroad; to prescribe their duties, fix their terms of office and compensation; and to define and punish all crimes relating to commerce within the sphere of the constitution. U. S. v. Coombs, 12 Pet. [37 U. S.] 72; U. S. v. Holliday, 3 Wall. [70 U. S.] 407.

(3) "To establish post-offices and post-roads." This gives authority to appoint a postmaster-general, and local postmasters throughout the country; to define their duties and compensation; to cause the mails to be carried by contract, or by the servants of the department, to all parts of the states and territories of the Union, and to foreign countries, and to punish crimes relating to the service, including obstructions to those engaged in transporting the mail while in the performance of their duty. The mail penal code comprises more than fifty offenses. All of them rest for their necessary constitutional sanction upon this power, thus briefly expressed.

(4) "To raise and support armies." This includes the power to enlist such number of men for such periods and at such rates of compensation as may be deemed proper; to provide all the necessary officers, equipments, and supplies, and to establish a military academy, where are taught military and such other sciences and branches of knowledge as may be deemed expedient, in order to prepare young men for the military service.

(5) "To provide and maintain a navy." This authorizes the government to buy or build any number of steam or other ships of war, to man, arm, and otherwise prepare them for war, and to dispatch them to any accessible part of the globe. Under this power the naval academy has been established. U. S. v. Beavan, 3 Wheat. [16 U. S.] 390.

These are but a small part of the powers which are incidental and appropriate to the main powers expressly granted. It is Utopian to believe that without such constructive powers, the powers expressed can be so executed as to meet the intentions of the framers of the constitution, and to accomplish the objects for which governments are instituted. The constitution provides expressly for the exercise of such powers to the full extent that may be "necessary and proper." No other limitation is imposed. Without this provision, the same result would have followed. The means of execution are inherently and inseparably a part of the power to be executed.

The constitution declares that "the senators and representatives before mentioned, and the members of the several state legislatures, and all executive and judicial officers, both of the United States and of the several states, shall be bound by oath to support this constitution." No other oath is required, "yet he would be charged with insanity who would contend that the legislature might not superadd to the oath directed by the constitution such other oath of office as its wisdom might suggest." McCulloch v. Maryland, 4 Wheat. [17 U. S.] 416.

The Bank of the United States, with all its faculties, was sustained because it was "convenient" and "appropriate" for the government in the management of its fiscal affairs. McCulloch v. Maryland, 4 Wheat. [17 U. S.] 316. Perhaps no measures of the national government have involved more doubt of their constitutionality than the acquisition of Louisiana and the embargo. Both were carried through congress by those who had been most strenuous for a strict construction of the constitution. Mr. Jefferson thought the former ultra vires, and advised an amendment of the constitution, but expressed a willingness to acquiesce if his friends should entertain a different opinion. 2 Story, Const. 160.

The Second Bank of the United States was a measure of the same class of thinkers. The acquisition of Florida involved the same question of constitutional power as the ac-

quisition of Louisiana. It was universally acquiesced in; and the constitutional question was not raised.

It is an axiom in our jurisprudence, that an act of congress is not to be pronounced unconstitutional unless the defect of power to pass it is so clear as to admit of no doubt. Every doubt is to be resolved in favor of the validity of the law. "The opposition between the constitution and the law should be such, that the judge feels a clear and strong conviction of their incompatibility with each other." Fletcher v. Peck, 6 Cranch [10 U. S.] 128. "The presumption, indeed, must always be in favor of the validity of laws, if the contrary is not clearly demonstrated." Cooper v. Telfair, 4 Dall. [4 U. S.] 18. "A remedial power in the constitution is to be construed liberally." Chisholm v. Georgia, 2 Dall. [2 U. S.] 476.

"Perhaps the safest rule of interpretation, after all, will be found to be to look to the nature and objects of the particular powers, duties, and rights, with all lights and aids of contemporary history, and to give to the words of each just such operation and force, consistent with their legitimate meaning, as may fairly secure and attain the ends proposed." Prigg v. Com., 16 Pet. [41 U. S.] 60.

Since the organization of the supreme court, but three acts of congress have been pronounced by that body void for unconstitutionality. Marbury v. Madison, 1 Cranch [5 U. S.] 137; Scott v. Sanford, 19 How. [60 U. S.] 393; Ex parte Garland, 4 Wall. [71 U. S.] 334.

The present effect of the amendment was to abolish slavery wherever it existed within the jurisdiction of the United States. In the future it throws its protection over every one, of every race, color, and condition within that jurisdiction, and guards them against the recurrence of the evil. The constitution, thus amended, consecrates the entire territory of the republic to freedom, as well as to free institutions. The amendment will continue to perform its function throughout the expanding domain of the nation, without limit of time or space. Present possessions and future acquisitions will be alike within the sphere of its operation.

Without any other provision than the first section of the amendment, congress would have had authority to give full effect to the abolition of slavery thereby decreed. It would have been competent to put in requisition the executive and judicial, as well as the legislative power, with all the energy needful for that purpose. The second section of the amendment was added out of abundant caution. It authorizes congress to select, from time to time, the means that might be deemed appropriate to the end. It employs a phrase which had been enlightened by well-considered judicial application. Any exercise of legislative power within its limits involves a legislative, and not a judicial question. It is only when the authority given has been clearly exceeded, that the judicial power can be invoked. Its office, then, is to repress and annul the excess; beyond that it is powerless.

We will now proceed to consider the state of things which existed before and at the time the amendment was adopted, the mischiefs complained of or apprehended, and the remedy intended to be provided for existing and anticipated evils.

When the late Civil War broke out, slavery of the African race subsisted in fifteen states of the Union. The legal code relating to persons in that condition was everywhere harsh and severe. An eminent writer said: "They cannot take property by descent or purchase; and all they find and all they own belongs to their master. They cannot make contracts, and they are deprived of civil rights. They are assets for the payment of debts, and cannot be emancipated by will or otherwise to the prejudice of creditors." 2 Kent, Comm. 281, 282.

In a note, it is added: "In Georgia, by an act of 1829, no person is permitted to teach a slave, a negro, or a free person of color to read or write. So in Virginia, by a statute of 1830, meetings of free negroes to learn reading or writing are unlawful, and subject them to corporal punishment; and it is unlawful for white persons to assemble with free negroes or slaves to teach them to read or write. The prohibitory act of the legislature of Alabama, passed at the session of 1831–2, relative to the instruction to be given to the slaves or free colored population, or exhortation, or preaching to them, or any mischievous influence attempted to be exerted over them, is sufficiently penal. Laws of similar import are presumed to exist in the other slaveholding states, but in Louisiana the law on the subject is armed with ten-fold severity. It not only forbids any person teaching slaves to read or write, but it declares that any person using language in any public discourse from the bar, bench, stage, or pulpit, or any other place, or in any private conversation, or making use of any sign or actions having a tendency to produce discontent among the free colored population or insubordination among the slaves, or who shall be knowingly instrumental in bringing into the state any paper, book, or pamphlet having a like tendency, shall, on conviction, be punishable with imprisonment or death, at the discretion of the court."

Slaves were imperfectly, if at all, protected from the grossest outrages by the whites. Justice was not for them. The charities and rights of the domestic relations had no legal existence among them. The shadow of the evil fell upon the free blacks. They had but few civil and no political rights in the slave states. Many of the badges of the bondman's degradation were fastened upon them. Their condition, like his, though not so bad, was helpless and hopeless. This is borne out by the passages we have given from Kent's

Commentaries. Further research would darken the picture. The states had always claimed and exercised the exclusive right to fix the status of all persons living within their jurisdiction.

On January 1, 1863, President Lincoln issued his proclamation of emancipation. Missouri and Maryland abolished slavery by their own voluntary action. Throughout the war the African race had evinced entire sympathy with the Union cause. At the close of the Rebellion two hundred thousand had become soldiers in the Union armies. The race had strong claims upon the justice and generosity of the nation. Weighty considerations of policy, humanity, and right were superadded. Slavery, in fact, still subsisted in thirteen states. Its simple abolition, leaving these laws and this exclusive power of the states over the emancipated in force, would have been a phantom of delusion. The hostility of the dominant class would have been animated with new ardor. Legislative oppression would have been increased in severity. Under the guise of police and other regulations slavery would have been in effect restored, perhaps in a worse form, and the gift of freedom would have been a curse instead of a blessing to those intended to be benefited. They would have had no longer the protection which the instinct of property leads its possessor to give in whatever form the property may exist. It was to guard against such evils that the second section of the amendment was framed. It was intended to give expressly to congress the requisite authority, and to leave no room for doubt or cavil upon the subject. The results have shown the wisdom of this forecast. Almost simultaneously with the adoption of the amendment this course of legislative oppression was begun. Hence, doubtless, the passage of the act under consideration. In the presence of these facts, who will say it is not an "appropriate" means of carrying out the object of the first section of the amendment, and a necessary and proper execution of the power conferred by the second? Blot out this act and deny the constitutional power to pass it, and the worst effects of slavery might speedily follow. It would be a virtual abrogation of the amendment.

It would be a remarkable anomaly if the national government, without this amendment, could confer citizenship on aliens of every race or color, and citizenship, with civil and political rights, on the "inhabitants" of Louisiana and Florida, without reference to race or color, and can not, with the help of the amendment, confer on those of the African race, who have been born and always lived within the United States, all that this law seeks to give them.

It was passed by the congress succeeding the one which proposed the amendment. Many of the members of both houses were the same. This fact is not without weight and significance. McCulloch v. Maryland, 4 Wheat. [17 U. S.] 401.

The amendment reversed and annulled the original policy of the constitution, which left it to each state to decide exclusively for itself whether slavery should or should not exist as a local institution, and what disabilities should attach to those of the servile race within its limits. The whites needed no relief or protection, and they are practically unaffected by the amendment. The emancipation which it wrought was an act of great national grace, and was doubtless intended to reach further in its effects as to every one within its scope, than the consequences of a manumission by a private individual.

We entertain no doubt of the constitutionality of the act in all its provisions. It gives only certain civil rights. Whether it was competent for congress to confer political rights also, involves a different inquiry. We have not found it necessary to consider the subject.

We are not unmindful of the opinion of the court of appeals of Kentucky, in the case of Brown v. Com. [4 Metc. (Ky.) 221]. With all our respect for the eminent tribunal from which it proceeded, we have found ourselves unable to concur in its conclusions. The constitutionality of the act is sustained by the supreme court of Indiana, and the chief justice of the court of appeals of Maryland, in able and well-considered opinions. Smith v. Moody, 26 Ind. 299; In re A. H. Somers.

We are happy to know that if we have erred the supreme court of the United States can revise our judgment and correct our error. The motion is overruled, and judgment will be entered upon the verdict.

Motion overruled.