*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0207P (6th Cir.)
File Name: 01a0207p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LYNETTE CHAPMAN,
*Plaintiff-Appellant,*

*v.*

THE HIGBEE COMPANY, d/b/a DILLARD DEPARTMENT STORES, INC.,
*Defendant-Appellee.*

No. 99-3970

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-00423—Patricia A. Hemann, Magistrate Judge.

Argued: October 27, 2000

Decided and Filed: July 5, 2001

Before: SUHRHEINRICH and MOORE, Circuit Judges; EDMUNDS, District Judge.[*]

---

## COUNSEL

**ARGUED:** David R. Grant, SMITH & CONDENI, Cleveland, Ohio, for Appellant. John B. Lewis, ARTER &

---

[*] The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

HADDEN, Cleveland, Ohio, for Appellee. **ON BRIEF:** David R. Grant, SMITH & CONDENI, Cleveland, Ohio, for Appellant. John B. Lewis, Thomas J. Piatak, ARTER & HADDEN, Cleveland, Ohio, Gregory E. O'Brien, Timothy D. Johnson, WESTON, HURD, FALLON, PAISLEY & HOWLEY, Cleveland, Ohio, for Appellee. Gino J. Scarselli, Cleveland, Ohio, Michael W. Donaldson, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, for Amici Curiae.

EDMUNDS, D. J., delivered the opinion of the court. SUHRHEINRICH, J. (pp. 23-36), delivered a separate concurring opinion. MOORE, J. (pp. 37-53), delivered a separate dissenting opinion.

---

## OPINION

---

EDMUNDS, District Judge. Plaintiff-Appellant, Lynette Chapman, brought suit against Defendant-Appellee, Dillard Department Store, alleging that her rights were violated when a department store security officer stopped and searched her due to a suspicion of shoplifting. Chapman alleges that the stop and search were racially motivated and violated her right to the "full and equal benefit of the law" under 42 U.S.C. § 1981 and her right to be free from unreasonable search and seizure under the Fourth Amendment pursuant to 42 U.S.C. § 1983. This case raises two issues: 1) whether section 1981 provides a cause of action against a private party under the equal benefit clause and 2) whether the security guard in this case acted "under color of law." The district court granted summary judgment in favor of Dillard on these issues, and Chapman now appeals.[1] We **AFFIRM**.

---

[1]The American Civil Liberties Union Foundation of Ohio, Inc. filed an amicus brief in favor of Chapman. The following merchants' associations from the states comprising the Sixth Circuit filed a joint amicus brief on behalf of Dillard: Ohio Council of Retail Merchants; Kentucky Retail Federation, Inc.; Michigan Retailers Association; and

## I.

Lynette Chapman is an African-American. On February 20, 1997, Chapman was shopping at Dillard Department Store in Cleveland, Ohio. She chose some clothing to try on, and a sales assistant pointed out a fitting room for her use. A white woman had just exited the fitting room and when Chapman entered, she noticed a sensor tag called a "kno-go" on the floor. After trying on some clothing, Chapman decided not to purchase anything and hung it back on the hangers. She left the fitting room to return the clothing to the racks. A sales assistant then entered the fitting room and noticed the sensor on the floor. Believing that the sensor had not been on the floor prior to Chapman's use of the fitting room and suspecting Chapman of shoplifting, the sales assistant notified security. A Dillard security guard then stopped Chapman and directed her back to the fitting room. He and a female manager checked Chapman's purse. Nothing was found. The female manager then accompanied Chapman into the fitting room and searched Chapman's clothing. The manager found nothing. Chapman pointed out the white woman whom she had seen exit the fitting room before she entered, but the security guard did not detain the white woman. Satisfied that Chapman had not stolen anything, the manager apologized to her, and Chapman left the store.

The Dillard security guard was an off-duty sheriff's deputy. He wore his official sheriff's department uniform, badge, and gun while working at Dillard. While he stopped and searched Chapman, he did not threaten to, or attempt to, arrest her.

As a result of this incident, Chapman brought suit against The Higbee Company, doing business as Dillard Department

---

Tennessee Council of Retail Merchants. The ACLU argues that the equal benefit clause of section 1981 should be interpreted to broadly prohibit race-based discrimination and that it applies to private action. The merchants' associations argue that they should be free to employ any lawful means to protect themselves against shoplifting and that § 1981 does not apply to private action. See *infra*.

Stores, Inc., alleging 1) a violation of the full and equal benefit clause of 42 U.S.C. § 1981 and 2) violations of Chapman's right to be free from unreasonable search and seizure under the Fourth Amendment and her right to due process under the Fifth Amendment, which rights Chapman may enforce via 42 U.S.C. § 1983. Dillard moved for summary judgment. A magistrate judge, acting pursuant to the consent of the parties, granted Dillard's motion for summary judgment finding: 1) Chapman does not have a claim under the full and equal benefit clause of § 1981 because the clause does not apply to private action; and 2) Chapman does not have a claim under § 1983 because the Dillard security officer was not acting "under color of state law." Chapman moved for reconsideration, and the magistrate denied the motion and reaffirmed its prior ruling. Chapman now appeals.

## II.

The standard of review for appeal of a summary judgment is *de novo*. *See Wolotsky v. Huhn,* 960 F.2d 1331, 1334 (6th Cir. 1992). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails "to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).



Although the majority states that "the security guard in this case did not perform or seek to perform his official duties as a sheriff's deputy," *supra* at 22, I believe there is a genuine issue of material fact as to whether, at the moment the security guard was required to seek the assistance of the police, that is, when the guard asked Chapman to enter the fitting room with the sales manager so that Chapman's clothes and person could be searched, the security guard became a state actor under the corporate policy. Because the majority failed to consider these facts, I believe that the majority's analysis is flawed and that summary judgment is inappropriate. I would reverse the district court's judgment on this issue as well.

policy on strip-searching[11] customers suspected of shoplifting, provides: "Strip searches are prohibited. If you suspect that stolen objects are hidden on [the shopper's] person, call the police." J.A. at 150.

According to the deposition testimony of Angelo Malena, senior security officer at Dillard and a police officer for the city of Cleveland, a security guard working at the Dillard at issue in this case cannot strictly comply with this corporate policy because, as he observed, "I guess we got to call ourselves, because we are the police." J.A. at 262 (Malena Test.). Malena testified that he informed Dillard's management of the conflict in the provision, but "they said, well, this came from the corporate, so it is a generalization of Dillard's policy throughout the country." J.A. at 262.

As the majority correctly noted, the Dillard security guard did not represent himself as a police officer, threaten to arrest Chapman, wave his badge or weapons, or establish any contact with the sheriff's department during the incident. The incident at issue in this case does, however, include the moment when Chapman was asked by the security guard to enter a fitting room with the sales manager to inspect her clothing. According to Dillard's official corporate policy, the security guard should have called the police at this point because he knew that the search involved the removal of Chapman's clothing. However, as Malena noted, the security officer cannot call the police pursuant to the policy because the security guard *is* the police.

[11]For the purposes of explaining the relationship between the store's policy and Chapman's claim, I must elaborate upon the majority's recitation of the facts. The majority states only that the female manager "searched Chapman's clothing." *See supra* at 3. Chapman alleges, however, and it is not disputed, that she was asked to remove her coat and her suit jacket, and to pull her blouse up over her head before the manager was satisfied that she had not stolen any merchandise. Although Dillard's policy does not define strip-searching, I believe that, because Chapman was forced to remove clothing, she was strip-searched by the Dillard's store manager, at the direction of the security guard.



## III.

### A.

Chapman argues that the Magistrate erred in finding that the full and equal benefit clause of § 1981 does not apply to private action. Section 1981 provides:

(a) Statement of equal rights

> *All persons within the jurisdiction of the United States shall have the same right* in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and *to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens*, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981 (emphasis added).[2]

[2]Section 1981 was originally passed pursuant to the Thirteenth and Fourteenth Amendments in order to eradicate the vestiges of slavery. *See Hawk v. Perillo*, 642 F. Supp. 380, 390 (N.D. Ill. 1985); *Provisional Gov't of the Republic of New Afrika v. American Broad. Cos.,* 609 F. Supp. 104, 109 (D.D.C. 1985).

Congress amended § 1981 in 1991 by designating the original section as subsection "(a)" and by adding subsections (b) and (c). Pub. L. 102-166, § 101.

Chapman claims that the addition of subsection (c) to the statute makes it clear that the full and equal benefit clause applies to private action. Chapman argues that subsection (c) is unambiguous and thus the Court should not look to legislative history in order to interpret the statute. Further, Chapman contends that subsection (c) refers to "the rights protected by this section" and that the plural word "rights" must mean *all* of the rights protected by subsection (a), the right to the full and equal benefit of the laws as well as the right to make and enforce contracts. Moreover, Chapman argues that the absence of limiting language distinguishes this provision from other civil rights laws. For example, 42 U.S.C. § 1983 applies to persons who act "under color of law." Because Congress chose not to limit the application of subsection (c), Chapman argues that subsection (c) must apply to all of the rights protected by § 1981.

It is axiomatic that a court may not look to legislative history in order to interpret a statute that is clear on its face. "There can be no construction where there is nothing to construe." *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 396 (1867); *Mahone v. Waddles*, 564 F.2d 1018, 1028 (3d Cir. 1977). If "the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *Vergos v. Gregg's Enters., Inc.*, 159 F.3d 989, 990 (6th Cir. 1998) (internal quotation marks and citations omitted).

We agree with Chapman that the statute is unambiguous and that it is not necessary to look to legislative history in order to interpret the statute's language. We disagree with Chapman's conclusion that the equal benefit clause applies to private action. Chapman's reading of subsection (c) is plausible only if subsection (c) is read in isolation. Yet, the statute must be read as a whole. Implicit in the concept of "full and equal benefit of all laws and proceedings for the security of persons and property" is state action. In other



> sidearm. He briefly stopped and searched Chapman, but did not arrest or threaten to arrest her, nor did he contact the sheriff's department. Under the circumstances of this case, the off-duty deputy did not act pursuant to his official duties and thus did not engage in state action.

*Supra* at 21.

Although in certain circumstances "it is possible to determine the question whether a person acted under color of state law as a matter of law, there may remain in some instances unanswered questions of fact regarding the proper characterization of the actions for the jury to decide." *Layne*, 627 F.2d at 13 (internal citations and quotations omitted). Based on my review of the record, I am convinced that Chapman has alleged sufficient facts to establish a genuine issue as to whether the security guard's actions satisfy the nexus test.[10] The nexus test requires a sufficiently close relationship between the state and the private actor so that the action taken by the latter may be fairly attributed to the state itself. *See Wolotsky*, 960 F.2d at 1335; *see also Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, ___,121 S. Ct. 924, 930 (2001) (noting that a challenged activity may be state action "when it is entwined with governmental policies or when government is entwined in [its] management or control.") (internal quotation omitted).

In this case, the Dillard security guard was obligated to obey Dillard's policies and regulations, which are developed by the corporation, while he was on-duty at the store. J.A. at 150 (Dillard's Rules and Procedures for Security Personnel). The state played no part in the promulgation of these policies. The policy does, however, directly implicate the state in one of its provisions. This provision, which offers the store's

[10] I agree with the majority that Chapman has alleged no facts to support a finding of state action under the public function test. *See Wolotsky*, 960 F.2d at 1335 (noting that public functions traditionally reserved to the state include holding elections or power of eminent domain).

violated under color of state law. *See* 42 U.S.C. § 1983. The majority affirmed the district court's grant of summary judgment on this claim to Dillard. I believe that there is a genuine issue of material fact as to whether the Dillard security guard's actions may "be fairly attributed to the state." *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000); *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). Therefore, I respectfully dissent from Part III.B of the majority's opinion as well.

The majority has correctly identified the legal standard for evaluating whether the acts of an off-duty police officer serving as a security guard may be deemed state action. As we have noted, "[t]he fact that a police officer is on or off duty, or in or out of uniform is not controlling. It is the nature of the act performed . . . which determines whether the officer has acted under color of law." *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975) (internal quotation omitted). Thus, my analysis turns primarily on whether the officer was acting pursuant to his official duty or a police department policy. *See Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir. 1980) (holding that officer who shot plaintiff while officer was off-duty acted under color of state law because officer's authority to carry weapon derived from his status as police officer, conflict between officer and plaintiff arose out of officer's official duties, and plaintiff threatened officer in officer's official capacity); *Stengel*, 522 F.2d at 441 (concluding that off-duty police officer who shot and killed two men and paralyzed a third in a barroom brawl acted under color of law because mace spray used by officer was issued by police department, and officer carried his pistol and intervened in dispute pursuant to department regulations). The majority has failed, however, to examine closely the record in this case to analyze whether there is a genuine issue of material fact to support Chapman's claim. Instead, the majority's analysis merely asserts:

> [T]he Dillard security guard who stopped and searched Chapman was an off-duty sheriff's deputy, wearing his official sheriff's department uniform, badge, and



words, because the state is the sole source of the law, it is only the state that can deny the full and equal benefit of the law. *See Mahone*, 564 F.2d at 1029. Thus, the full and equal benefit clause of subsection (a) can only refer to state action. With this understanding of the full and equal benefit clause, subsection (c) is properly understood as clarifying the nature of the various "rights" enumerated in subsection (a). That is, the "rights . . . protected against impairment by nongovernmental discrimination" applies to the "make and enforce contracts" clause, while the "rights . . . protected against . . . impairment under color of State law" refers to such clauses as the "full and equal benefit" clause of subsection (a). Because Chapman's reading places subsection (a) and (c) in conflict, we reject it.

Even if Chapman's interpretation were correct, we could still look beyond the language of the statute if a literal interpretation would lead to 1) internal inconsistencies, 2) an absurd result, or 3) an interpretation inconsistent with the intent of Congress. *See Vergos*, 159 F.3d at 990. First, Chapman's reading of subsection (c) leads to an internal inconsistency. As discussed, subsection (c) cannot protect the right to equal benefit of all laws and proceedings from nongovernmental discrimination when only the government can deny equal benefit of all laws and proceedings.

Second, interpreting the equal benefit clause as applying to private action creates the absurd result of federalizing state tort law. The Supreme Court has cautioned against the creation of a general federal tort law. "[A]s a rule we should be and are 'reluctant to federalize' matters traditionally covered by state common law." *Patterson v. McLean Credit Union,* 491 U.S. 164, 183 (1989). As other courts have observed, § 1981 was designed to remove obstacles to full participation in the legal system and to provide blacks equal access to legal remedies and processes, not to federalize private torts. *See Sterling v. Kazmierczak,* 983 F. Supp. 1186, 1192 (N.D. Ill. 1997).

Finally, Chapman's interpretation is inconsistent with the intent of Congress. Chapman contends that the legislative history establishes that the purpose of the 1991 amendments was to respond to recent decisions of the Supreme Court by broadly expanding the scope of relevant civil rights statutes. The Congressional record, however, does not support such a broad intent. The legislative history reflects that in adding subsection (c) to the statute, Congress merely codified *Runyon v. McCrary*, 427 U.S. 160 (1976), which held that § 1981's contract clause applied to private entities. H. Rep. No. 40, 102d Cong., 1st Sess., Pt. II, at 37 (1991) (this subsection is intended to codify *Runyon*).[3] *See Philippeaux v. North Cen. Bronx Hosp.*, 871 F. Supp. 640, 655 (S.D.N.Y. 1991); *accord Ebrahimi v. City of Huntsville Bd. of Educ.*, 905 F. Supp. 993, 995 n.2 (N.D. Ala. 1995). *See also Dennis v. County of Fairfax*, 55 F.3d 151 (4th Cir. 1995) (1991 amendments do not overrule *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989), which held that 42 U.S.C. § 1983 is exclusive remedy for violation of § 1981 by state action). Further, if Congress had intended to create a tort remedy for victims of private racially-motivated discrimination, "Congress would not have departed so abruptly from current decisional law without stating explicitly that it was doing so." *Spencer v. Casavilla*, 839 F. Supp. 1014, 1019 n.9 (S.D.N.Y. 1993), *aff'd in part, appeal dismissed in part*, 44 F.3d 74 (2d Cir. 1994). "If the 'equal benefit' clause of § 1981 were extended . . . to reach private action, the court sees no limiting principle to prevent its becoming the 'general federal tort law' the Supreme Court has expressly rejected." *Id.* at 1019.

[3] The legislative history of the 1991 amendments only briefly mentions subsection (c). It largely focuses upon subsection (b), which was enacted in order to overrule part of the Supreme Court's opinion in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1991). In *Patterson*, the Supreme Court held that § 1981's prohibition against discrimination in contracting applied only to the formation of contracts and not to post contract discrimination. Section 1981(b) was added to prohibit post contract discrimination as well.



the Act had before it ample evidence of private acts of racial discrimination against the newly emancipated slaves.[9]

Consistent with my understanding of § 1981's history, I believe the statute deserves a broad interpretation because it is part of a remedial statute. The majority's reading patently violates the canon of statutory construction that commands courts to interpret remedial statutes broadly. It does so in the name of a competing canon: that of interpreting federal statutes narrowly so as not to invade upon areas of traditional state concern. As I have already demonstrated, however, the majority's over-reliance on this principle is in error, as there is no likelihood that my reading of the statute will result in a flood of litigation in federal courts that properly belongs in state court. Because I am firmly convinced that the majority's reasoning is faithful neither to the statute's language nor to its deeply-rooted constitutional origins, I dissent from Part III.A of the majority's opinion requiring state action for a cause of action under the "full and equal benefit" clause. I would reverse the district court's grant of summary judgment to Dillard on this issue.

## II. STATE ACTION

As an alternative to her § 1981 claim that Dillard denied her the "full and equal benefit" of the law, Chapman also seeks relief under 42 U.S.C. § 1983 for alleged violations of her right to be free from unreasonable searches and seizures under the Fourth Amendment and her due process rights under the Fifth Amendment. As the majority noted, a litigant bringing a claim under § 1983 must show that her rights were

[9] To appreciate fully how implausible the majority and the concurrence's reasoning is, one need only turn to the original language of the 1866 Act: on their reading, we would have to believe that the first clause, the right to "make and enforce contracts," and the fifth clause, the right to inherit, purchase, lease, sell, hold, and convey real and personal property, would apply to private conduct, while the second, third, fourth, sixth and seventh clauses would not. *See supra* note 5 for text of Act. I cannot believe that the Congress that enacted the 1866 Act meant to create such an interpretive labyrinth.

of the 1866 Act, the Court in *Runyon* determined that there was no reason to construe the legislative history differently for § 1981 than it had for § 1982; consequently, the Court held that the "make and enforce contracts" clause of § 1981 must apply to private as well as public contracts. *See Runyon*, 427 U.S. at 170-71.

Reviewing the history of the 1866 Act in *General Bldg. Contractors*, Chief Justice Rehnquist noted:

> [T]his Court has found in the legislative history of the 1866 Act evidence that Congress sought to accomplish more than the destruction of state-imposed civil disabilities and discriminatory punishments. We have held that both § 1981 and § 1982 'prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein.'

*General Bldg. Contractors*, 458 U.S. at 387 (quoting *Jones*, 392 U.S. at 436). Indeed, the Chief Justice observed that, in passing the 1866 Act, Congress "acted to protect the [newly] freedmen from intentional discrimination by those whose object was 'to make their former slaves dependent serfs, victims of unjust laws, and debarred from all progress and elevation by organized social prejudices.'" *Id.* at 388 (quoting Cong. Globe, 39th Cong., 1st Sess., 1839 (1866) (Rep. Clarke)). Clearly, then, the drafters of the 1866 Act had private as well as state-inflicted discrimination in mind when they passed the Act, from which the "full and equal benefit" clause derives verbatim.

I believe that the history of § 1981, as explicated by the Supreme Court in numerous decisions, gives rise to the inescapable conclusion that the "full and equal benefit" clause, like the "make and enforce contracts" clause and the other protections offered by the statute, does not require state action. I cannot ignore, as do the majority and the concurrence, that the 1866 Act was passed pursuant to the Thirteenth Amendment and the Congress which considered



This result is also supported by the case law. The majority of courts, both pre- and post- the 1991 amendment, have held that the full and equal benefit clause applies to state action and not to private action. In one of the first cases to consider the issue, *Mahone, supra,* the Third Circuit distinguished between the two substantive provisions of § 1981, observing that the right to make and enforce contracts is concerned with relations between private individuals, and thus private individuals can be held liable for violating § 1981's contract clause,[4] whereas the equal benefit clause concerns the relations between an individual and the state and thus only state actors can be liable under the equal benefit clause.

> The state, not the individual, is the sole source of the law, and it is only the state acting through its agents, not the private individual, which is capable of denying to blacks the full and equal benefit of the law. Thus, while private discrimination may be implicated by the contract clause of section 1981, *the concept of state action is implicit in the equal benefits clause.*

564 F.2d at 1029 (emphasis added). *Accord Shaare Tefila Congregation v. Cobb*, 785 F.2d 523, 525-26 (4th Cir. 1986), *rev'd in part on other grounds*, 481 U.S. 615 (1987); *Lewis v. J.C. Penney Co.,* 948 F. Supp. 367, 371 (D. Del. 1996); *Spencer*, 839 F. Supp. at 1018-19; *Brooks v. ABC*, 737 F. Supp. 431, 440 (N.D. Ohio 1990), *vacated in part on other grounds*, 932 F. 2d 495 (6th Cir. 1991); *Rochon v. Dillon*, 713 F. Supp. 1167, 1172 (N.D. Ill. 1989); *Provisional Gov't of the Republic of New Afrika v. American Broad. Cos.*, 609 F. Supp. 104, 109 (D.D.C. 1985); *Eggleston v. Prince Edward Volunteer Rescue Squad*, 569 F. Supp. 1344, 1353 (E.D. Va. 1983), *aff'd without op.,* 742 F.2d 1448 (4th Cir. 1984);

---

[4] Chapman did not allege a cause of action under the "make and enforce contracts" clause of § 1981. Courts have rejected such a claim made by plaintiffs who were falsely accused of shoplifting. *See e.g., Lewis v. J.C. Penney Co.,* 948 F. Supp. 367, 373 (D. Del. 1996) (no refusal to contract where plaintiff had completed shopping and was leaving store).

*Williams v. Northfield Mount Hermon Sch.*, 504 F. Supp. 1319, 1332 (D. Mass. 1981). *See also Sterling*, 983 F. Supp. at 1192 (equal benefit clause does not create federal tort remedy against private party).

These courts have emphasized that interpreting the clause to apply to private action would give rise to a federal cause of action for every racially motivated private tort. *See Mahone*, 564 F.2d at 1029.

> Although it is conceptually possible for a private party to deprive another of the "equal benefit" of those laws, it is difficult to imagine what such a deprivation would be other than the violation of the state laws themselves, coupled with a racial animus. Reading the clause to encompass this kind of conduct, however, risks creating a § 1981 action "whenever a white man strikes a black [man] in a barroom brawl."

*Spencer*, 839 F. Supp. at 1019.

A minority of courts have held that the equal benefit clause applies to private action. *See Franceschi v. Hyatt Corp.*, 782 F. Supp. 712, 724 (D.P.R. 1992) (cause of action under equal benefit clause against private hotel for denial of accommodation based on race); *Carey v. Rudeseal,* 703 F. Supp. 929, 930 n.1 (N.D. Ga. 1988) (cause of action under equal benefit clause against members of Ku Klux Klan for assault); *Hawk v. Perillo*, 642 F. Supp. 380, 392 (N.D. Ill. 1985) (cause of action under equal benefit clause against individuals who committed racially-motivated assault); *Central Presbyterian Church v. Black Liberation Front*, 303 F. Supp. 894, 898-99 (E.D. Mo. 1969) (cause of action under equal benefit clause against individuals who interfered with First Amendment freedom to worship by disrupting church service).



> private individuals and unofficial groups, mistreatment unrelated to any hostile state legislation. 'Accounts in newspapers North and South, Freedmen's Bureau and other official documents, private reports and correspondence were all adduced' to show that 'private outrage and atrocity' were 'daily inflicted on freedmen . . . .' The congressional debates are replete with references to private injustices against Negroes — references to white employers who refused to pay their Negro workers, white planters who agreed among themselves not to hire freed slaves without the permission of their former masters, white citizens who assaulted Negroes or who combined to drive them out of their communities.

*Jones*, 392 U.S. at 427-28 (internal citations and footnotes omitted). The Supreme Court rejected the suggestion that the 1866 Act was passed exclusively in response to restrictive state laws, noting that "the Civil Rights Act was drafted to apply throughout the country, and its language was far broader than would have been necessary to strike down discriminatory statutes." *Id.* at 426-27. In *Jones*, the Supreme Court held that because 42 U.S.C. § 1982, a sister statute to § 1981, was derived from § 1 of the Civil Rights Act of 1866 and the Act was passed pursuant to the Thirteenth Amendment, § 1982 must reach private acts of racial discrimination. *See Jones*, 392 U.S. at 436 (noting that "[i]n light of the concerns that led Congress to adopt it and the contents of the debates that preceded its passage, it is clear that the Act was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein . . . .").

Thereafter, in *Runyon v. McCrary*, the Supreme Court affirmed that § 1981 prohibits racial discrimination in the making and enforcement of private contracts by private actors. *Runyon v. McCrary*, 427 U.S. 160, 168 (1976). The Court's holding in *Runyon* was based upon its earlier decision in *Jones*. Noting that both §§ 1981 and 1982 derive from § 1

pursuant to the Fourteenth Amendment and applies only to state action.[8] Section 1 of the 1866 Act and § 16 of the 1870 Act were later recodified in § 1977 of the Revised Statutes of 1874 and ultimately recodified in 42 U.S.C. § 1981. *Id.* at 385. The 1866 Act, when first enacted, clearly applied to private conduct.

According to the Supreme Court, the scope of the 1866 Act was not altered when it was reenacted in 1870 pursuant to the Fourteenth Amendment, despite the fact that "some members of Congress supported the Fourteenth Amendment in order to eliminate doubt as to the constitutional validity of the Civil Rights Act [of 1866] as applied to the States." *Jones*, 392 U.S. at 436 (internal quotation omitted). Moreover, the Court has rejected the idea that the adoption of the Fourteenth Amendment or the reenactment of the 1866 Act "were meant somehow to limit the statute's application to state action." *Id.*; *accord General Bldg. Contractors*, 458 U.S. at 387-88.

The Supreme Court has repeatedly remarked upon the evidence of private discrimination that motivated the original statute's drafters. In *Jones v. Alfred H. Mayer Co.*, the Supreme Court, in discussing why the 1866 Act was passed, noted that Congress had before it evidence of pervasive private discrimination and racial violence, as well as the fact of the southern states' recently-enacted Black Codes:

> [T]he same Congress that wanted to do away with the Black Codes *also* had before it an imposing body of evidence pointing to the mistreatment of Negroes by

[8]The Fourteenth Amendment was sent to the states for ratification just two months after passage of the 1866 Act, and was ratified in 1868. Many who supported passage of the Fourteenth Amendment viewed it as the constitutionalization of the 1866 Act. *See Jett*, 491 U.S. at 722. The Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.



In *Hawk v. Perillo*,[5] 642 F. Supp. 380, the leading opinion for the minority view, the court examined the legislative history of the statute and found that it should be interpreted broadly. Section 1981 originated in section 1 of the Civil Rights Act of 1866.[6] When Congress enacted the 1866 statute, it intended to eliminate all race discrimination, both public and private, because "[d]uring the Congressional debates, assaults on blacks by private citizens were referred to on several occasions." *Hawk*, 642 F. Supp. at 391 (citing Cong. Globe, 39th Cong., 1st Sess., 339-40, 1835).

This general reference, however, did not manifest in the language of the equal benefit clause, which refers only to "the full and equal benefit of all laws and proceedings for the security of persons and property . . . ." Thus, *Hawk's* reasoning that "[t]he absence of any words expressly limiting Section 1981 to official acts of discrimination indicates that Congress did not intend to restrict the operation of that Section to such conduct," 642 F. Supp. at 390, is in error.

[5]*Hawk v. Perillo* has since been rejected by another court in the Northern District of Illinois. *See* *Rochon v. Dillon*, 713 F. Supp. 1167, 1172 (N.D. Ill. 1989) (court elected to follow *Mahone*).

[6]Section 1 of the Civil Rights Act of 1866, the predecessor to 42 U.S.C. § 1981, provided:

> That all persons born in the United States and not subject to any foreign power, . . . are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, . . . shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to *full and equal benefit of all laws and proceedings for the security of person and property*, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

(Emphasis added.)

The equal benefit clause of § 1981 is limited to state action because it is understood that only the state is capable of granting or denying equal access to the law. "[T]he concept of state action is implicit in the equal benefits clause." *Mahone*, 564 F.2d at 1029.

*Hawk* found further support for its broad interpretation by looking to three other statutes: 1) section 2 of the Civil Rights Act of 1866; 2) 42 U.S.C. § 1982; and 3) 42 U.S.C. § 1985(3). First, section 2 of the Civil Rights Act of 1866 provided for criminal sanctions against persons who violated the rights secured by section 1 by acting under color of law.[7] In other words, private acts of discrimination were exempted from criminal sanction. *Hawk* inferred from this distinction that the rights secured by section 1 must have been rights to be free of private as well as public discrimination. *See Hawk,* 642 F. Supp. at 391. This reasoning, however, goes too far. The section 2 exemption of some private conduct from criminal sanctions does not establish that *all* of the rights covered in section 1 were rights protected from private discrimination.

Second, *Hawk* pointed out that section 1 of the Civil Rights Act of 1866 was the predecessor to 42 U.S.C. § 1982, which

[7] Section 2 of the Civil Rights Act of 1866 provided:

> That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court.



375, 384 (1982). Congress passed the 1866 Act during the Reconstruction Era pursuant to its power under § 2 of the then recently ratified Thirteenth Amendment to the Constitution,[6] which does not require state action, "to determine what are the badges and the incidents of slavery, and . . . to translate that determination into effective legislation." *Runyon*, 427 U.S. at 170 (quoting *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968)); *accord Watson v. Fraternal Order of Eagles*, 915 F.2d 235, 241 (6th Cir. 1990) ("Congress enacted § 1981 pursuant to the Thirteenth Amendment . . . to ensure that all of the badges and incidents of slavery faded into an ignominious past."). Section 1 of the 1866 Act was substantially reenacted[7] at § 16 of the Enforcement Act of 1870, ch. 114, § 16, 16 Stat. 140, 144, which was passed

derives from the Civil Rights Act of 1866 and was recodified in § 18 of the Enforcement Act of 1870, ch. 114, § 18, 16 Stat. 144. The current statute provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.

[6] The Thirteenth Amendment, which was ratified on Dec. 18, 1865, provides that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. CONST. amend. XIII, § 1. Under the second section of the Amendment, Congress is granted the "power to enforce this article by appropriate legislation." U.S. CONST. amend. XIII, § 2. Less than three weeks after the passage of the Amendment, the bill that was to become the Civil Rights Act of 1866 was introduced. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 713-14 (1989).

[7] According to the Supreme Court, "[s]ection 16 differed from § 1 of the 1866 Act in at least two respects. First, where § 1 of the 1866 Act extended its guarantees to 'citizens, of every race and color,' § 16 of the 1870 Act — and § 1981 — protects 'all persons.' Second, the 1870 Act omitted language contained in the 1866 Act, and eventually codified as § 1982, guaranteeing property rights equivalent to those enjoyed by white citizens." *General Bldg. Contractors*, 458 U.S. at 385-86 (internal citation omitted). The entire 1866 Act was also re-enacted in § 18 of the Act of 1870, ch. 114, § 18, 16 Stat. 140. *Id.* at 386 n.11.

by the majority, especially in light of the broad language Congress employed in subsection (c). Congress's failure to comment upon statutory language does not offer a reviewing court *carte blanche* to rewrite the statute to fit its own subjective understanding of Congress's unstated intent.[4] Moreover, I note that the majority ignores the committee's stated purpose in drafting the 1991 amendment: "to strengthen existing protections and remedies available under federal civil rights laws to provide more effective deterrence and adequate compensation for victims of discrimination." H.R. REP. NO. 102-40(II), at 1, *reprinted in* 1991 U.S.C.C.A.N. at 694.

Finally, I believe that the majority's analysis fails to account for § 1981's constitutional legacy. Present-day civil rights statute 42 U.S.C. § 1981 is derived from § 1 of the Civil Rights Act of 1866 ("1866 Act"), ch. 31, § 1, 14 Stat. 27.[5] *See General Bldg. Contractors Ass'n v. Penn.*, 458 U.S.

[4] Judge Suhrheinrich believes that "Congress did not need to explain that the equal benefit and like punishment clauses of subsection (a) do not apply to private conduct *because they logically cannot*." *Supra* at 30. I have already explained why I believe that Judge Suhrheinrich's logic is flawed: first, there is nothing in either the language or statutory history of § 1981 that restricts the "equal benefit" clause to state action, notwithstanding Judge Suhrheinrich's claims to the contrary; and second, his analysis of the "like punishment" clause ignores the historical context from which § 1981 derives.

[5] Section 1 of the Civil Rights Act of 1866 provided:

> [C]itizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, . . . shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

Act of Apr. 9, 1866, ch. 31, § 1, 14 Stat. 27. 42 U.S.C. § 1982 also



prohibits discrimination in property transactions.[8] Because of their common origin, courts interpret 1981 and 1982 similarly. So it follows, according to *Hawk*, that because § 1982 applies to private action, § 1981 must apply to private action. *See id*. Again, however, the protection from private discrimination in the context of property transfers, which is afforded by §1982, does not establish that the equal benefit clause of § 1981 extends to private discrimination.

Finally, the *Hawk* court compared § 1981 to 42 U.S.C. § 1985(3) and noted that § 1985(3) contains some language similar to the equal benefit clause. Section 1985(3) provides, "If two or more persons . . . conspire . . . or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for recovery of damages . . . ." The Supreme Court has interpreted § 1985(3) as applying to private as well as official action. *See Griffen v. Breckenridge*, 403 U.S. 88, 101 (1971). Accordingly, the court in *Hawk* found that the equal benefit clause of 1981 similarly applies to private action. *See Hawk*, 642 F. Supp. 392.

Section 1981 is not analogous to § 1985(3) even though § 1981 refers to "the full and equal benefit of all laws and proceedings" and § 1985(3) refers to "equal protection of the laws." Unlike § 1981, § 1985(3) expressly applies to private

[8] 42 U.S.C. § 1982 provides:

> All citizens of the United States shall have the same rights, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

action by referring to "two or more persons" who conspire. Section 1981 contains no such language.[9]

In sum, we hold that § 1981's equal benefit clause applies only to state action. Thus, the district court's grant of summary judgment and dismissal of Chapman's § 1981 claim is affirmed. Chapman's remedy lies in state law.

**B.**

Chapman alleges in her Complaint that Dillard violated her constitutional rights under 42 U.S.C. § 1983, specifically, her Fourth Amendment right to be free from unreasonable search and seizure and her Fifth Amendment right not to be deprived of life, liberty, or property without due process.[10] In order to

[9] In addition, the *Hawk* court ignored the need, recognized in *Griffen*, to confine the reach of the federal civil rights laws so as not to create a general federal tort law. *See Griffen v. Breckenridge*, 403 U.S. 88, 101 (1971).

[10] While it was not addressed below, Chapman does not have a viable Fifth Amendment claim in this case. The Fifth Amendment applies to federal action, not to private action or state action. *See Bolling v. Sharpe*, 347 U.S. 497 (1954). Because Dillard is not in any way associated with the federal government, Chapman has no claim under the Fifth Amendment. *See Three Rivers Cablevision Inc. v. City of Pittsburgh*, 502 F. Supp. 1118, 1134 (W.D. Pa. 1980). The Court could liberally construe the Complaint as alleging due process claim under the Fourteenth Amendment. However, because Chapman's claim is specifically covered by the Fourth Amendment, she does not have a due process claim under the Fourteenth Amendment. Violations of substantive due process originally were divided into two kinds: (1) deprivation of a particular constitutional guarantee, and (2) actions that government officials may not take no matter what procedural protections accompany them, alternatively known as actions that "shock the conscience." *See Braley v. City of Pontiac*, 906 F.2d 220, 224-25 (6th Cir. 1990) (citing *Rochin v. California*, 342 U.S. 165 (1952)). An unreasonable search or seizure is a violation of the Fourth Amendment, made applicable to the states through the Fourteenth Amendment. Thus, a Fourth Amendment violation gives rise to a substantive due process violation of the first type. *See Wilson v. Beebe*, 779 F.2d 578 (6th Cir. 1985). The Supreme Court has made it clear that a Fourth Amendment



claim, a litigant must prove intentional discrimination on the basis of race, which involves a high threshold of proof. Because of these significant limitations, I do not believe that the proper reading of the statute makes actionable a wide swath of conduct traditionally covered by state common law, nor do I foresee a flood of litigation in the federal courts.[3]

The majority's analysis is neither borne out by the language nor the legislative history of this statute. There is nothing in the legislative history of the 1991 amendments that gives me reason to believe that the word "rights" has a meaning less robust than a natural reading of the word would permit. The majority asserts that "[t]he legislative history reflects that in adding subsection (c) to the statute, Congress merely codified *Runyon v. McCrary*, 427 U.S. 160 (1976), which held that § 1981's contract clause applied to private entities." *Supra* at 8. I find the legislative history remarkable only for the paucity of commentary on subsection (c). Of the two House Committee Reports on the Civil Rights Act of 1991, only one even mentions subsection (c) and that discussion is terse. The House Judiciary Committee authored H.R. Report No. 102-40(II), which states not only that Congress intended to codify *Runyon* but also that Congress intended subsection (c) "to prohibit racial discrimination in all contracts, both public and private." H.R. REP. NO. 102-40(II), at 37 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 731. I do not believe that Congress's failure to discuss the application of subsection (c) to the other rights enumerated in subsection (a) may properly give rise to the narrow meaning ascribed to the word "rights"

animus).

[3] Moreover, I note that the argument that Chapman's reading of the statute would improperly federalize state tort law was once embraced by the Supreme Court in *Patterson*, 491 U.S. at 183, as support for the Court's decision that the "make and enforce contracts" clause did not cover claims of employment discrimination involving anything more than the formation of a contract, a decision which was then legislatively overruled by Congress in the Civil Rights Act of 1991. *See* 42 U.S.C. § 1981(b).

which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters. In such cases, the intention of the drafters, rather than the strict language, controls.") (internal quotation omitted). A result is not absurd merely because it does not comport with the reviewing court's notion of what constitutes good policy. We typically embark upon the exceptional task of divining Congress's intent outside the literal language of the statute only when the statute produces a result, not which we dislike, but which is patently illogical or contrary to Congress's intent.

Second, the majority has failed to consider adequately the limiting language surrounding the "full and equal benefit" clause which serves to cabin both the number and nature of claims that may be brought under this clause. Of course "we should be and are 'reluctant to federalize' matters traditionally covered by state common law." *Patterson v. McLean Credit Union*, 491 U.S. 164, 183 (1989) (internal quotation omitted). The clause at issue, however, may only be invoked when one party denies another the "full and equal benefit of all laws and proceedings for *the security of persons and property* as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (emphasis added). The "security of persons and property" clause clearly limits the potential class of cases which may be brought under this section. A litigant must demonstrate that he or she was either denied the benefit of a law or proceeding that protected a cognizable property right or that involved a claim of personal security.[2] Moreover, to bring successfully a § 1981

[2] Several cases that have allowed "full and equal benefit" claims to go forward without state action have involved serious threats to a person's security in the form of physical violence. *See, e.g.*, *Carey v. Rudeseal*, 703 F. Supp. 929, 930 n.1 (N.D. Ga. 1988) (noting that court had allowed "full and equal benefit" claim against private actor involved in Ku Klux Klan incident because § 1981 "provides a cause of action against private individuals for racially-motivated, intentionally-inflicted injury and does not require state action in the deprivation of rights"); *Hawk v. Perillo*, 642 F. Supp. 380, 386-87, 390 (N.D. Ill. 1986) (construing language and history of statute to allow claim against private individual who engaged in vicious beating of plaintiffs motivated by racial



state a claim under § 1983, Chapman must show that Dillard deprived her of her constitutional rights "under color of state law." *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327 (1986). The requirement of state action serves two important public policies. First, it preserves individual freedom by limiting the reach of federal power. Second, it avoids imposing on the state responsibility for conduct for which it cannot be fairly blamed. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982).

A private party's actions constitute state action under § 1983 where the private entity's actions may be "fairly attributable to the state." *Lugar,* 457 U.S. at 937. In order to determine whether there was state action in a particular case, the Supreme Court has developed three tests: 1) the public function test; 2) the state compulsion test; and 3) the symbiotic relationship or nexus test. *See Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). In her brief on appeal, Chapman argues that summary judgment should have been denied because there was a genuine issue of material fact regarding whether there was state action under either the public function test or the nexus test.

### 1. Public Function Test

Under the public function test, a private party is deemed to be a state actor if he exercised powers traditionally exclusively reserved to the state. This has been interpreted narrowly. Only functions like holding elections, *see Flagg Bros. v. Brooks*, 436 U.S. 149 (1978), exercising eminent domain, *see Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974), and operating a company-owned town, *see Marsh v. Alabama*, 326 U.S. 501, 505-09 (1946), fall under this category of state action. Courts have consistently held that

claim of unreasonable search and seizure cannot be a substantive due process violation of the second type, as it must be analyzed under the reasonableness standard, not the "shocks the conscience" standard. *See United States v. Lanier*, 117 S. Ct. 1219, 1228 n. 7 (1997).

the mere fact that the performance of private security functions may entail the investigation of a crime does not transform the actions of a private security officer into state action. *See Wade v. Byles*, 83 F.3d 902, 905 (7th Cir. 1996); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1457 (10th Cir. 1995); *White v. Scrivner Corp.,* 594 F.2d 140, 142-43 (5th Cir. 1979).

In *White*, the Fifth Circuit held that the detention of a suspected shoplifter is not an exclusive state function.

> A merchant's detention of persons suspected of stealing store property simply is not an action exclusively associated with the state. Experience teaches that the prime responsibility for protection of personal property remains with the individual. A storekeeper's central motivation in detaining a person whom he believes to be in the act of stealing his property is self-protection, not altruism. Such action cannot logically be attributed to the state.

594 F.2d at 142 (citation omitted). Applying these principles to the case at hand, the Court is satisfied that the Dillard security officer was not performing a function exclusively reserved to the State when he stopped and searched Chapman. Under the public function test, there was no state action.

### 2. Symbiotic Relationship/Nexus Test

Under the symbiotic or nexus test, a plaintiff must demonstrate that there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be treated as that of the state itself. *See Jackson*, 419 U.S. at 351. Thus, a state can be held responsible for a private action when it has "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Simescu v. Emmet County Dept. of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). The state must be intimately



the concurrence's quotidian premise, but I reject its conclusion as logically flawed. Although the state does make the law, one private actor may deprive another of the full and equal benefit of those laws just as readily as a state actor, as when the state provides for equal access to public facilities by law and private persons design to deny racial minorities access to such places through intimidation, or when a private actor subjects another to a physical attack which was racially inspired.

Tellingly, the only support the majority can muster for its assessment that "the full and equal benefit clause of subsection (a) can only refer to state action," *supra* at 7, is a Third Circuit decision, *Mahone v. Waddle*, 564 F.2d 1018 (3d Cir. 1977), authored before the 1991 amendments adding the language in subsection (c). Left unstated by the majority is the fact that neither the Supreme Court nor this court has ever limited the application of subsection (c) to the "make and enforce contracts" clause in subsection (a). While it is true that the "make and enforce contracts" clause is the most litigated clause of the statute, none of the other enumerated rights have been read out of the statute by the Supreme Court. With no legal authority to guide it, the majority would have done well to err on the side of caution by giving the words of subsection (c) their "ordinary, contemporary, common meaning." *Hudson*, 130 F.3d at 1199 (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Instead, the majority's conclusion that the word "rights" in subsection (c) refers only to the rights to make and enforce a contract places an undue restriction upon the language of the statute which is not dictated or even suggested by our precedent.

The majority also claims that Chapman's reading of the statute produces "the absurd result of federalizing state tort law." *Supra* at 7. First, I believe the majority misuses the doctrine of statutory interpretation which obliges a reviewing court to eschew the literal language of a statute when it produces an absurd result. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in

The majority contends that the statute is unambiguous and that it is clear that the word "rights" means only certain rights. According to the majority, "[i]mplicit in the concept of 'full and equal benefit of all laws and proceedings for the security of persons and property' is state action." *Supra* at 5. I believe the majority's analysis is inherently flawed. First, the majority does not interpret the plain language of the statute, as it should; instead, the majority admittedly imputes meaning to the language when it looks to what is "implicit" in the phrase "full and equal benefit of all laws." The majority states that "because the state is the sole source of the law, it is only the state that can deny the full and equal benefit of the law." *Supra* at 7. Because the majority insists on assigning its own meaning to the statute's language, the majority is compelled to segregate awkwardly certain phrases in subsection (a) from the application of the language in subsection (c). Thus, on the majority's reading, only one of the enumerated rights in subsection (a), the right to make and enforce contracts, may be violated by a private act of discrimination while the other enumerated rights may not. I discern no basis in the statute's language for such a strained, unnatural reading of the statute. *Cf. Franceschi v. Hyatt Corp.*, 782 F. Supp. 712, 718-19 (D. P.R.) ("We will not adhere to the dubious and illogical position that the first half of § 1981 does not have a state action requirement while the second does."). Indeed, I believe that, had Congress intended to cramp the meaning of the word "rights," it easily could have done so when it amended the statute and added subsection (c). As noted above, however, Congress included no such limiting language in the statute. The majority claims that Chapman's reading of the statute is internally inconsistent. As the preceding discussion reveals, I believe it is the majority that must engage in interpretive contortions to arrive at its desired result.

Second, I disagree with the substance of the majority and the concurrence's assertion that the full and equal benefit clause requires state action because "[o]nly the state can prescribe laws, and [therefore] only the state can *deprive* an individual of the benefit of those laws." *Supra* at 25. I accept



involved in the challenged conduct. *See Wolotsky*, 960 F.2d at 1335.

The inquiry is fact specific and the presence of state action is determined on a case by case basis. *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961). Factors tending to show state action must be examined individually and in the aggregate. *Simescu,* 942 F.2d at 375. Applying the state action doctrine, however, is "slippery and troublesome." *International Soc'y for Krishna Consciousness, Inc. v. Air Canada*, 727 F.2d 253, 255 (2d Cir. 1984). It has been referred to as the "paragon of unclarity." *Gallagher,* 49 F.3d at 1447. This is particularly true in the area of off-duty police officers acting as security guards.

The acts of an on-duty police officer are acts done "under color of law," whether done in the proper performance of official duties or whether done outside of the officer's authority. "Acts of [police] officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it." *Screws v. United States*, 325 U.S. 91, 111 (1945). Further, courts have consistently held that an off-duty police officer who works as a security guard engages in state action when he seeks to perform official police duties *and* presents himself as a police officer via a statement identifying himself, a uniform, or a badge. For example, in *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999), the court found state action in the case of an off-duty officer who worked as a security guard in a shopping mall. The court explained that she acted under color of law when she shot a shoplifter because she was wearing a police uniform, she repeatedly ordered the suspect to stop, and she sought to arrest the suspect. *See id.* at 287. *Accord Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423 (10th Cir. 1984) (off-duty, out of uniform police officer employed as store security guard who showed badge and identified himself as police acted under color of law); *Benschoter v. Brown*, No. 96-2366-JWL, 1997 U.S. Dist. Lexis 9804 (D. Kan. June 12, 1997) (security guards who identified themselves as police and told plaintiff he could be arrested for unsafe driving were not state

actors because they did not take police action by arresting plaintiff; instead they called their private employer); *Herrera v. Chisox Corp.*, No. 93 C 4279, 1995 U.S. Dist. Lexis 14719 (N.D. Ill. Oct. 6, 1995) (when off-duty, out of uniform police officers employed as stadium security guards detained suspected ticket scalper in stadium office, they did not act under color of law because they did not take any action related to their duties as police); *Ewing v. Budget Rent-A-Car*, No. 92C 1714, 1992 U.S. Dist. Lexis 14999 (N.D. Ill. Sept. 30, 1992) (no state action where off-duty out of uniform police woman identified herself as off-duty officer and called police to make arrest).

The Sixth Circuit has gone even further by holding that when an officer acts pursuant to his official duty, even without identifying himself as a policeman and without a uniform or badge, he engages in state action. *See Stengel v. Belcher*, 522 F.2d 438 (6th Cir. 1975). The fact that a police officer is on or off duty, or in or out of uniform, does not determine whether his actions are state actions. Courts must examine the nature of the act performed. *See id.* at 441. In *Stengel*, an off-duty police officer intervened in a barroom dispute. The officer maced, shot, and killed two individuals and paralyzed a third during the altercation. The individuals brought a civil rights suit, and the officer defended, claiming that he was not liable under § 1983 because his actions were not taken under color of law. The officer claimed that at the time he was engaged in private social activity and was acting as a private citizen. Although the officer was not on duty and not in uniform and he did not identify himself as an officer at any time during the altercation, the court held that he was in fact a state actor. He used mace and a pistol that the police department required him to carry at all times, and, most importantly, police department policy required him to take action to intervene in any criminal activity, even when he was off-duty. The officer acted pursuant to his official duty.

In contrast, when a police officer acts as a private citizen, not pursuant to police department policy and without identifying himself as an officer, his actions are private



enumerated rights in subsection (a).[1] The "full and equal benefit" clause is one of those rights.

---

[1] In his concurring opinion, Judge Suhrheinrich states that my analysis of § 1981 must be incorrect because "[n]o one can seriously argue that an individual can subject another individual to unequal punishment or taxes" and that therefore the "like punishment" clause must require state action. *Supra* at 26. He argues that "[t]he only way the dissent's argument works is if one strips the language of the second and third subclauses of subsection (a) of their plain meaning." *Supra* at 28. Judge Suhrheinrich's analysis has superficial appeal because our present-day understanding of the terms "punishment," "pains," "penalties," etc., calls to mind state involvement. In our experience, it is the state that usually imposes punishment, etc. upon its citizens. Such was not the case, however, when the Act of 1866, the precursor to § 1981, was passed. At that time, Congress was especially concerned with prohibiting those incidents of private, racially motivated violence — the punishment, pains, or penalties — which were commonplace in the South. The Congress that debated the 1866 Act had before it reports that "described a pattern of private violence 'by men who announce their determination to take the law into their own hands . . . .' This violence was not random, based on mere racial animosity, but frequently was aimed at preventing the Freedmen from exercising their new rights . . . ." *Barry Sullivan, Historical Reconstruction, Reconstruction History, and the Proper Scope of Section 1981*, 98 YALE L.J. 541, 553 (1989) (footnote omitted). Indeed, the 1866 Act "was proposed and finally adopted against [a] background of restrictive laws, private discrimination, and violence." *Barry L. Refsin, The Lost Clauses of Section 1981: A Source of Greater Protection After* Patterson v. McLean Credit Union, 138 U. PA. L. REV. 1209, 1217 (1990).

As my discussion, *infra*, of the history surrounding the passage of the 1866 Act reveals, the statute's original phrasing, which included the language "punishment, pains, and penalties," was directed to private conduct. While later language, including the phrase "taxes, licenses, and exactions," which was added in 1870, may indeed refer primarily to state action, this would only mean that the "like punishment" clause may be invoked by either private *or* state action, depending on which explicit guarantee of equal treatment is implicated. Indeed, I believe the 1870 language was added to *expand* the protections of the "like punishment" clause, not to minimize them. In any case, I do not believe that possible ambiguity surrounding the "like punishment" clause detracts from my argument that the "full and equal benefit" clause may be invoked by public *and* private conduct, as it is incontestible that this language has been present in the statute since its inception.

(c) Protection against impairment

> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981(a), (c).

I believe that the language of this statute is perfectly clear: according to subsection (c), the rights protected by subsection (a), *i.e.*, the rights "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property," are protected against impairment by private acts of discrimination. Subsection (c) does not state that *some* rights in the section are protected but others are not; there is no modifier limiting the word "rights" to only certain phrases in subsection (a). On my reading of the literal language of the two sections, as written and then purposefully amended by Congress, the "rights protected by this section" must, according to that phrase's natural meaning, mean all



actions which do not fall under § 1983. For example, in *Barna v. City of Perth Amboy*, 42 F.3d 809 (3d Cir. 1994), off-duty officers who were out of their jurisdiction assaulted an individual during a personal altercation. The court held that the officers did not act under color of law, even though they used an official night stick during the assault. The court emphasized that while the use of the official weapon "furthered" the constitutional violation, courts generally require additional indicia of state authority before finding state action. *See id.* at 817 & 819.

Similarly, in *Robinson v. Davis*, 447 F.2d 753, 758-59 (4th Cir. 1971), the court held that town police employed as part time college security officers did not act under color of law in the course of questioning students during a college initiated drug investigation. Although the officers wore their town police uniforms and sidearms, they did not perform any duty imposed on them by the state and they did not purport to act as town police during the investigation. The college had instructed them not to make any arrests during the investigation.

Just as an off-duty police officer who acts with actual authority, *see Stengel*, *supra,* is deemed to be a state actor, a private party who purports to exercise official authority can be a state actor. "It is [also] clear that under 'color' of law means under 'pretense' of law." *Screws*, 325 U.S. at 111. In *Griffen v. Maryland*, 378 U.S. 130 (1964), a private park employed a security guard who was deputized as a county sheriff. Although the guard was an agent of the private park owner and acted as a private security guard, the Court held that he acted under color of law. When he ordered the plaintiff to leave the park, escorted him out, and arrested him, the guard wore a county sheriff's badge, identified himself as a deputy sheriff, and purported to exercise the authority of a deputy sheriff. *See id.* at 135.

> If an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same

> action had he acted in a purely private capacity or that the particular action which he took was not authorized by state law.

*Id*.

In the context of store security officers, courts also have found state action where there was a prearranged plan between the police and the merchant. Thus, in *Smith v. Brookshire Bros.,* 519 F.2d 93 (5th Cir. 1975), the court held that there was state action because the police routinely arrested suspected shoplifters solely based on the information provided by the merchant without any independent investigation. *Cf. Cruz v. Donnelly*, 727 F.2d 79 (3d Cir. 1984) (where no preexisting plan between merchant and police and police conducted independent investigation, merchant's detention of suspected shoplifter was not state action); *White,* 594 F.2d at 143 (same). Where a state statute authorizes a merchant to detain a suspected shoplifter for the purpose of calling the police, a merchant who acts pursuant to the statute is engaged in private action, so long as the police make the arrest based on their own judgment and not based on a preexisting plan or based solely on the merchant's judgment. *See Lewis,* 948 F. Supp. at 373; *Anderson v. Randall Park Mall Corp.,* 571 F. Supp. 1173, 1175-76 (N.D. Ohio 1983). "[S]tate action cannot be found where . . . the [state] statutes do not compel detention of trespassers or shoplifters, but merely authorize and acquiesce in certain procedures for detention if a private party elects to do so." *Id.* at 1176.

Courts have also looked to other factors to determine whether there was state action, such as government regulation, the existence of a government contract, and dual employment. Each of these standing alone has been deemed insufficient to constitute state action. *See Jackson,* 419 U.S. at 350-52 (extensive governmental regulation, standing alone, is not sufficient to establish state action); *Rendell-Baker v. Kohn*, 457 U.S. 830, 840-42 (1982) (mere fact that private entity contracted with government does not convert the



## DISSENT

KAREN NELSON MOORE, Circuit Judge, dissenting. I respectfully dissent from both the majority's determination that the "full and equal benefit" clause in 42 U.S.C. § 1981 does not apply to private conduct and its conclusion with respect to the § 1983 claim that there is no genuine issue of material fact as to whether the Dillard security guard's actions were fairly attributable to the state.

### I. "FULL AND EQUAL BENEFIT" CLAUSE

I begin, as I must, by examining the language of the statute. *Hudson v. Reno*, 130 F.3d 1193, 1199 (6th Cir. 1997) ("A familiar canon of statutory construction is that the starting point for interpreting a statute is the language of the statute itself."). Section 1981 states:

> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> ***

*Id.* at 163. The *Runyon* Court relied on its earlier decision in *Jones* to hold that the "make and enforce contracts" clause of § 1981 applies to private as well as public contracts. *Id.* at 170. The *Runyon* court emphasized the common heritage of §§ 1981 and 1982. *Id.* Again, however, the issue before the court, the making and enforcing of a contract, like the sale or lease of property, is the kind of undertaking that private, as well as state actors are capable of performing. Thus, the *Runyon* Court's remarks should not be stretched to fit a dissimilar category of conduct.

Finally, the dissent urges a broad interpretation because § 1981 is part of a remedial statute. However, as we have stated in the past, the mere fact that a statute has a broad remedial purpose is not a *carte blanche* for a court to expand the statute to include protections not described in the statute. *Cf. Nixon v. Kent County*, 76 F.3d 1381, 1390 (6th Cir. 1996) (en banc) (holding that the amendments to the Voting Rights Act did "not . . . reflect a broad and boundless 'trend' to expand the Act to protect classes not described in the Act, or to protect combinations of classes not described in the Act").

In short, the dissent's interpretation must be rejected as a facile attempt at analyzing a complex and multi-faceted statute that seeks to eliminate various forms of private discrimination and various forms of discriminatory state action.



private actions into state actions); *Wolotsky*, 960 F.2d at 1336 ("Acts of private contractors do not become the acts of the government by reason of their significant or even total engagement in performing public contracts."); *Simescu*, 942 F.2d at 375 (fact that individual is dual employee of private sector and of government for purposes of workers' compensation is not relevant).

Here, the Dillard security guard who stopped and searched Chapman was an off-duty sheriff's deputy, wearing his official sheriff's department uniform, badge, and sidearm. He briefly stopped and searched Chapman, but did not arrest or threaten to arrest her, nor did he contact the sheriff's department. Under the circumstances of this case, the off-duty deputy did not act pursuant to his official duties and thus did not engage in state action.

Chapman argues that the security guard was a state actor because as an off-duty sheriff's deputy he had the power to arrest and to transport suspects to the police station, he could sign an arrest warrant with his rank and badge number, and he could run an outstanding warrant check on detained suspects and arrest on any outstanding warrant. While the off-duty officer/security guard retained the power to act as a sheriff's deputy, in this case he did not exercise that power. He did not arrest or threaten to arrest Chapman, nor did he contact the sheriff's department. The nature of his actions were not state actions.

Chapman also argues that there was state action because the sheriff's department retains control over the deputies while they work at Dillard. The sheriff's department requires off-duty officers to follow department rules and procedures, the department has to approve of a deputy working at Dillard, and the department can terminate an officer's off-duty work at Dillard. Also, the department posts job openings at Dillard. In addition, until April of 1998 there was an annual written indemnity and hold harmless agreement between Dillard and the sheriff department. Chapman's argument lacks merit because none of the foregoing facts amounts to evidence of a

prearranged plan between the sheriff's department and Dillard concerning the execution or scope of the security officer's duties, nor does it constitute evidence of a state law which compelled the security guard to act. *See Lewis*, 948 F. Supp. at 373; *Anderson*, 571 F. Supp. at 1175-76. Moreover, as explained above, the security guard in this case did not perform or seek to perform his official duties as a sheriff's deputy; instead, he acted pursuant to his duties as a private security guard. Accordingly, the district court's ruling granting summary judgment in favor of Dillard and dismissing the § 1983 claim is affirmed.

**IV.**

The equal benefit clause of 42 U.S.C. § 1981 requires state action as does 42 U.S.C. § 1983. Because the actions of the off-duty sheriff's deputy Dillard employed as a security guard in this case were private actions, the district court's dismissal of Chapman's claims against Dillard under §§ 1981 and 1983 is **AFFIRMED**.



Against this legal landscape, the Supreme Court was asked to decide whether § 1982 reached acts of private parties in the seminal case of *Jones v. Alfred H. Mayer Co.*, *supra*. There a private real estate developer refused to sell or lease land or housing to African Americans. The issue in the *Jones* case was framed as whether "purely *private* discrimination, unaided by any action on the part of the government, would violate § 1982 if its effect were to deny a citizen the right to rent or buy property solely because of his race or color." *Id.* at 419 (emphasis added).

The respondents in *Jones* argued that "the only evil Congress sought to eliminate was that of racially discriminatory laws in the former Confederate States [i.e. the Black Codes]." *Id.* at 426. However, a majority of the Court found that the Thirty-ninth Congress intended to secure the right to purchase and lease property against interference from any source whatever, "whether governmental or private." 392 U.S. at 424. The Court held "that § 1982 bars all racial discrimination, private as well as public, in the sale or rental of property, and that the statute, thus, construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment." *Id.* at 413. The Court also overruled *Hodges*' holding that the Thirteenth Amendment was intended to prohibit only slavery. *Id.* at 441-43 n.78.

Thus, the central issue in *Jones* was whether § 1982 could be applied to private discrimination at all, because the Supreme Court had, up to that time, limited civil rights enforcement to eliminating slavery and to discriminatory state action. Further, the conduct at issue in § 1982, the sale or leasing of property, is the type of behavior in which both state and private actors are capable of engaging. Indeed, as the Supreme Court observed, the right to purchase and lease property "can be impaired as effectively by 'those who place property on the market' as by the State itself." *Id.* at 420-21.

In *Runyon*, the principal issue was "whether a federal law, namely 42 U.S.C. § 1981, prohibits private schools from excluding qualified children solely because they are Negroes."

Amendment as conferring upon all Americans, not just former slaves, the status and rights of citizenship); *In re Turner*, 24 Cas. 337 (C.C.D. Md. 1867) (No. 14,2470) (holding that a black child apprenticeship to her former owner after slavery was declared illegal in Maryland violated the full and equal benefit clause of the 1866 Act); *United States v. Cruikshank*, 25 Cas. 707 (C.C.D. La. 1874) (No. 14, 897), *aff'd*, 92 U.S. 542 (1875) (Justice Bradley, stating in dictum that the 1866 Act was an example of Congress's power to "give full effect" to the Thirteenth Amendment's "bestowment of liberty"); *see generally* Comment, Sondra Hemeryck, ed., Cassandra Butts, et al, *Reconstruction, Deconstruction and Legislative Response: The 1988 Supreme Court Term and the Civil Rights Act of* 1990, 25 Harv. C.R.-C.L. L. Rev. 475, 476-86 (1990); *The Lost Causes of Section 1981*, 138 U. Pa. L. Rev. at 1218-19, this perception faded as the Supreme Court limited Congress's authority under the Thirteenth and Fourteenth Amendments to regulate private behavior. *See* Erwin Chemerinsky, Constitutional Law § 3.6 at 213 (3d ed. 1997); *Reconstruction, Deconstruction and Legislative Response*, 25 Harv. C.R.-C.L. L. Rev. at 486-92; *The Lost Causes of Section 1981*, 138 U. Pa. L. Rev. at 1218-19.

In the landmark *Civil Rights Cases*, 109 U.S. 3 (1883), the Supreme Court held that, under the Thirteenth Amendment, Congress's power was limited to banning slavery and could not be used to eliminate discrimination. *Id.* The Court also held that the Fourteenth Amendment only applies to government action and could not be a source for Congress to regulate private behavior. *Id; see also The Slaughter House Cases*, 83 U.S. (16 Wall.) 36 (1873) (stating that the purpose of the Thirteenth and Fourteenth Amendments was solely to protect former slaves). This view persisted for nearly a century. *See* Chemerinsky, § 3.6.1; *see also Hodges v. United States*, 203 U.S. 1, 19 (1906) (holding that § 1981 did not authorize a cause of action for conspiracy by whites to prevent blacks from working in a sawmill because "it was not the intent of the [Thirteenth] Amendment to denounce every act done to an individual that was wrong if done to a free man and yet justified in a condition of slavery").



---

## CONCURRENCE

---

SUHRHEINRICH, Circuit Judge, concurring. I fully concur in the majority's reasoning. I write separately to respond to the dissent.

The dissent believes that the language of § 1981 is perfectly clear: "according to subsection (c), the rights protected by subsection (a), *i.e.*, the rights 'to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property,' are protected against impairment by private acts of discrimination." *Ante,* at 38. The dissent feels that because there is no modifier limiting the word "rights" to only certain clauses in subsection (a), the phrase "rights protected by this section" must mean all enumerated rights in subsection (a).[1]

---

[1] The dissent also argues that "the limiting language surrounding the 'full and equal benefit' clause . . . serves to cabin both the number and nature of claims that may be brought under this clause." *Ante, at* 42. In other words, the dissent claims that its interpretation of § 1981 would not have the "absurd result of federalizing tort law" because "the full and equal benefit of all laws and proceedings" is limited to those "*for the security of persons and property* as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (emphasis added).

However, one need look no further than the opening pages of Prosser on Torts to understand that the limiting phrase "for the security of persons and property" encompasses tort law:

> Included under the head of torts are miscellaneous civil wrongs, ranging from simple, direct interferences with the person, such as assault, battery and false imprisonment, or with property, as in the case of trespass or conversion, up through various forms of negligence, to disturbances of intangible interests, such as those in good reputation, or commercial or social advantage. . . . [I]t is not easy to discover any general principle upon which they may all be based, unless it is the obvious one that injuries are to be compensated,

However, to read the statute this way requires one to *not* read the phrase "full and equal benefit of all laws and proceedings" according to its ordinary and common meaning. As the dictionary definition establishes, implicit in the concept of "law" is state action: "a binding custom or practice of a community: a rule or mode of conduct or action that is prescribed or formally recognized as binding by a supreme controlling authority or is made obligatory by a sanction (as an edict, decree, rescript, order, ordinance, statute, resolution, rule, judicial decision, or usage) made, recognized, or enforced by the controlling authority." WEBSTER'S THIRD INTERNATIONAL DICTIONARY

---

> and anti-social behavior is to be discouraged.
> . . . .
> There remains a body of law whch [sic] is directed toward the compensation of individuals, rather than the public, for losses which they have suffered within the scope of their legally recognized interests generally, rather than one interest only, where the law considers that compensation is required. This is the law of torts.
>
> The law of torts, then, is concerned with the allocations of losses arising out of human activities; and since they cover a wide scope, so does this branch of law. "Arising out of the various and ever-increasing clashes of the activities of persons living in a common society, carrying on business in competition with fellow members of that society, owning property which may in any of a thousand ways affect the persons of property of others – in short, doing all the things that constitute modern living – there must of necessity be losses, or injuries of many kinds sustained as a result of the activities of others. The purpose of the law of torts is to adjust these losses, and to afford compensation for injuries sustained by one person as the result of the conduct of another.

Prosser & Keeton on Torts, § 1, p. 3-6 (5th ed. 1984).

In short, under the dissent's interpretation, the equal benefit clause could be applied to every garden-variety state tort claim with a racial component. If this is not federalization of tort law, I do not know what is.



> respect to the rights enumerated therein." *Jones v. Alfred H. Mayer Co.*, 392 US, at 436. . . .

*Gen. Bldg. Contractors*, 458 U.S. at 386-87 (emphases added; footnotes omitted). In light of the United States Supreme Court's interpretation of the legislative history of § 1981, the dissent's position is untenable.

Equally invalid is the rationalization that the equal benefit and like punishment clauses of § 1981(a) apply to private conduct because the 1866 Act rested only on the Thirteenth Amendment and was enacted before the Fourteenth Amendment was formally proposed. All this proves is that the Thirteenth Amendment was the *source* of Congress's *authority* for doing what it set out to do in the 1866 Act. *See* U.S. Const. amend. XIII, § 2; *The Civil Rights Cases*, 109 U.S. 3, 30 (1883) (noting that the Thirteenth Amendment authorized Congress to enact legislation abolishing the "badges and incidents of slavery"). Furthermore, the current statute has a shared history in the Thirteenth and Fourteenth Amendments. The 1866 Act was reenacted in 1870, pursuant to the Fourteenth Amendment. *See Gen. Bldg. Contractors*, 458 U.S. at 386 ("[a]lthough the 1866 Act rested only on the Thirteenth Amendment . . . and, indeed, was enacted before the Fourteenth Amendment was formally proposed, . . . the 1870 Act was passed pursuant to the Fourteenth, and changes in wording may have reflected the language of the Fourteenth Amendment" (internal quotation marks omitted)).

The dissent also cobbles together select passages from *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), and *Runyon v. McCrary*, 427 U.S. 160 (1976). The dissent's analysis works only if these quotations are divorced from their historical and immediate context. Although early interpretations of the 1866 Act took a broad view of the protections provided by the statute, *see, e.g., United States v. Rhodes*, 27 Cas. 785 (C.C.D. Ky. 1866) (No. 16, 151) (Supreme Court Justice Swayne, sitting by designation on Kentucky Circuit Court, upholding the constitutionality of the Civil Rights Act of 1866, interpreting the Thirteenth

*Price*, 383 U.S. 787, 803 . . . (1966). The Civil War had ended in April 1865. The First Session of the Thirty-ninth Congress met on December 4, 1865, some six months after the preceding Congress had sent to the States the Thirteenth Amendment and just two weeks before the Secretary of State certified the Amendment's ratification. On January 5, 1866, Senator Trumbull introduced the bill that would become the 1866 Act.

*The principal object of the legislation was to eradicate the Black Codes, laws enacted by Southern legislatures imposing a range of civil disabilities on freedmen. Most of these laws embodied express racial classifications and although others, such as those penalizing vagrancy, were facially neutral, Congress plainly perceived all of them as consciously conceived methods of resurrecting the incidents of slavery.* Senator Trumbull summarized the paramount aims of his bill:

> "Since the abolition of slavery *the Legislatures* which have assembled in the insurrectionary *States have passed new laws* relating to the freedmen, and in nearly all the *States* they have discriminated against them. They deny them certain rights, *subject them to severe penalties*, and still impose upon them the very restrictions which were imposed upon them in consequence [of] the existence of slavery, and before it was abolished. The purpose of the bill under consideration is to destroy all these discriminations, and to carry into effect the [Thirteenth] amendment." Cong. Globe, 39th Cong, 1st Sess, 474 (1866).

. . .

Of course, this Court has found in the legislative history of the 1866 Act evidence that Congress *sought to accomplish more than the destruction of state-imposed civil disabilities and punishments*. We have held that both § 1981 and § 1982, "prohibit all racial discrimination, whether or not under color of law, with



1278 (1986). This perception of the term "law" would have been shared by members of the Thirty-ninth Congress:

> Law:
> 1. A rule, *particularly* an established or permanent rule, prescribed by the supreme power of a state to its subjects, for regulating their actions, particularly their social actions. Laws are *imperative* or *mandatory*, commanding what shall be done; *prohibitory*, restraining from what is to be forborne; or *permissive*, declaring what may be done without incurring a penalty.

Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE at 651 (rev. & enlarged, Springfield, Mass., George & Charles Merriam 1864). And it is to the dictionary that we look in determining the plain meaning of a word. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 420, 120 S. Ct. 1479, 1488 (2000) (employing dictionary definitions to ascertain the ordinary, commonsense meaning of words in statute); *United States v. Johnson*, 529 U.S. 53, 120 S. Ct. 1114 (2000) (same).

Only the state can prescribe laws, and only the state can *deprive* an individual of the benefit of those laws.[2] As the Third Circuit observed, and as the majority noted:

> The state, not the individual, is the sole source of law, and it is only the state acting through its agents, not the private individual, which is capable of denying to blacks the full and equal benefit of the law. Thus, while private discrimination may be implicated by the contract clause

[2] By contrast, an individual *violates* laws. An individual may cause injury to another in the process of violating a law, but this cannot rightly be viewed as a *deprivation* of "the full and equal benefit of all law and proceedings for the security of persons and property." That is because a private actor does not give protections under the law, and therefore cannot take them away. Private injury can be redressed by law, however.

of section 1981, the concept of state action is implicit in the equal benefit clause.

*Mahone v. Waddle*, 564 F.d 1018, 1029 (3d Cir. 1977).[3]

Ironically, the dissent omits reference to the third clause in subsection (a): the like punishment clause, which provides that "[a]ll persons . . . shall be subject to like punishment, pains, penalties, taxes, license, and exactions." No one can seriously argue that an individual can subject another individual to unequal punishment or taxes. As *Mahone* remarked: "Only the state imposes or requires 'taxes, licenses, and exactions' and the maxim *noscitur a sociis* suggests that the 'punishment, pains [and] penalties' to which the clause refers are those imposed by the state." *Id.* Yet, to accept the dissent's argument, one must agree that the like punishment clause applies to private conduct as well.

The dissent responds to this argument with the following remark: "In our experience, it is the state that usually imposes punishment, etc. upon its citizens. Such was not the case, however, when the Act of 1866, the precursor to § 1981, was passed." *Ante*, at 39 n.1. In addition to being a highly selective interpretation of history, *see, e.g.,* Barry Sullivan, *Historical Reconstruction, Reconstruction History, and the Proper Scope of Section 1981*, 98 Yale L.J. 541, 549 (1989) ("The Black Codes enacted by the Southern states under Presidential Reconstruction, as well as widespread acts of private discrimination and violence against Freedmen, convinced Republican leaders that legislative action was

[3]The dissent finds significance in the fact that "neither the Supreme Court nor this court has ever limited the application of subsection (c) to the 'make and enforce contracts' clause in subsection (a)." *Ante*, at 41. True. Also true is the fact that neither this Court nor the Supreme Court has ever been presented with the question of whether the equal benefit or like punishment clause covers private conduct. As the dissent well knows, federal courts are not at leisure to comment on issues not properly before them.



*Bldg. Contractors Ass'n v. Penn.*, 458 U.S. 375, 386 (1982) ("The principal object of the legislation was to eradicate the Black Codes, laws enacted by Southern legislatures imposing a range of civil disabilities on freedmen"), as well as discriminatory private conduct, *i.e.,* mistreatment of Blacks by private individuals, *see id.* at 387 ("Of course, this Court has found in the legislative history of the 1866 Act evidence that Congress sought to accomplish more than the destruction of state-imposed civil disabilities and discriminatory punishments."). This explains why the two statutes address such varied concerns, some of which deal with private conduct like contracts and property rights, and some of which deal with state action, like protection of laws and proceedings and punishments and penalties.

Notwithstanding these rather clear pronouncements by the Supreme Court, the dissent asserts that:

> In our experience, it is the state that usually imposes punishment, etc. upon its citizens. Such was not the case, however, when the Act of 1866, the precursor to § 1981, was passed. At that time, Congress was especially concerned with prohibiting those incidents of private, racially motivated violence – the punishment, pains, or penalties – which were commonplace in the South.
>
> . . . .
>
> As my discussion, *infra*, of the history surrounding the passage of the 1866 Act reveals, the statute's original phrasing, which included the language "punishment, pains, or penalties," was directed to private conduct.

*Ante*, at 39 n.1.

Although she quotes from it, Judge Moore has not provided the Supreme Court's entire explanation of the history of § 1981 in *General Building Contractors*:

> [W]e must be mindful of the "events and passions of the time" in which the law was forged. *United States v.*

explain that the effect of subsection (c) on other rights enumerated in subsection (a) means that "rights" must mean that subsection (a) refers to the right to full and equal benefit of all laws and proceedings, like punishment, as well as the right to make and enforce contracts. However, Congress does not need to state the obvious. That is, Congress did not need to explain that the equal benefit and like punishment clauses of subsection (a) do not apply to private conduct *because they logically cannot*.

The dissent also derives support from § 1981's "constitutional legacy." *Ante*, at 44. The dissent has a tough row to hoe here. As the dissent acknowledges, § 1981 emanates not only from the Thirteenth Amendment, but also the Fourteenth Amendment.[7] As the dissent also acknowledges, §§ 1981 and 1982 were responding to discriminatory state action , *i.e.,* the Black Codes, *see Gen.*

contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

[7]In *General Bldg. Contractors Ass'n v. Penn.*, 458 U.S. 375 (1982), the Court explained:

> [T]he origins of the law can be traced to both the Civil Rights Act of 1866 and the Enforcement Act of 1870. Both of these laws, in turn, were legislative cousins of the Fourteenth Amendment. The 1866 Act represented Congress' first attempt to ensure equal rights for the freedmen following the formal abolition of slavery effected by the Thirteenth Amendment. As such, it constituted an initial blueprint of the Fourteenth Amendment, which Congress proposed in part as a means of "incorporat[ing] the guaranties of the Civil Rights Act in the organic law of the land." *Hurd v. Hodge*, 334 U.S., at 32 . . . . The 1870 Act, which contained the language that now appears in § 1981, was enacted as a means of enforcing the recently ratified Fourteenth Amendment. In light of the close connection between these Acts and the Amendment, it would be incongruous to construe the principal object of their successor, § 1981, in a manner markedly different than that of the Amendment itself.

*Id.* at 389-90 (footnotes omitted).



needed.")[4]; Barry L. Refsin, *The Lost Clauses of Section 1981: A Source of Greater Protection After* Patterson v. McLean Credit Union, 138 U. Pa. L. Rev. 1209, 1217 (1990) (noting that the 1866 Act "was proposed and finally adopted against [a] background of *restrictive laws*, *[and]* private discrimination, and violence" (emphasis added)), the dissent's remark ignores the common understanding of these terms at the time the 1866 Act was passed. The following definitions are found in the 1864 edition of Noah Webster's AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE, *supra*:

> Punishment:
> n. Any pain or suffering inflicted on a person for a crime or offense, by the authority to which the offender is subject, either by the constitution of God or of civil society. The *punishment* of the faults and offenses of children, by the parent, is by virtue of the right of government with which the parent is invested by God himself. This species of *punishment* is *chastisement* or *correction*. The *punishment* of crimes against the laws is inflicted by the supreme power of the state, in virtue of the right of government vested in the prince or legislature. The right of *punishment* belongs only to persons clothed with authority. Pain, loss, or evil, willfully inflicted on another, for his crimes or offenses, by a private, unauthorized person, is *revenge*, rather than *punishment*.

at 889.

> Penalty:

[4]The dissent relies on a phrase in a congressional report before the Thirty-ninth Congress describing "a pattern of private violence 'by men who announce their determination to take the law into their own hands.'" *Historical Reconstruction,* 98 Yale L.J. at 553 (quoting S. EXEC. DOC. No. 2, 39th Cong., 1st Sess. at 18 (quoting report of Brigadier General Fessenden)). The dissent maintains that this colloquialism supports the argument that the terms "punishment, pains, and penalties," as used in a section in the United States Code, means something other than the dictionary definitions of those terms. I do not think such a figure of speech should carry more weight than the dictionary definitions in matters of statutory interpretation.

> 1. The suffering in person or property which is annexed by law or judicial *decision* to the commission of a crime, offense, or trespass, as a punishment. A fine is a pecuniary *penalty*. The ususal *penalties* inflicted on the person are whipping, cropping, branding, imprisonment, hard labor, transportation, or death.

at 810.

> Pain:
>
> (n.) 1. An uneasy sensation in animal bodies, of any degree from slight uneasiness to extreme distress or torture, proceeding from pressure, tension, or spasm, separation of parts by violence, or any derangement of functions. This violent pressure or stretching of a limb gives *pain*; inflammation produces *pain*; wounds, bruises, and incisions give *pain*.
>
> . . . .
>
> 6. Penalty; punishment suffered or denounced; suffering or evil inflicted as punishment for a crime, or annexed to the commission of a crime.

at 790.

In short, there is little support for the dissent's semantical argument.[5]

The only way the dissent's argument works is if one strips the language of the second and third subclauses of subsection (a) of their plain meaning. This approach violates another equally fundamental canon of statutory construction: "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Furthermore, a statute is to be read in its entirety, *see Ratzlaf v. United States*, 510 U.S. 135, 140 (1994), so as to avoid an absurd construction of a statutory provision. *See New York Life Ins. Co. v. United States*, 190 F.3d 1372, 1382 (Fed. Cir. 1999). The dissent's reading of the statute produces an absurd result because a private individual simply cannot deprive another of the equal benefit of the laws or subject another to any punishment or tax.

[5] Furthermore, the argument strains the limits of common sense. As one treatise has observed: "Whether this clause of section 1981 is limited to state action, it is virtually inevitable that any claim based upon 'like punishment, pains, penalties, taxes, license, and exactions of every kind,' will involve a governmental entity . . . . " Cook & Sobieski, 2 CIVIL RIGHTS ACTIONS, ¶ 5.03(D) (Matthew Bender & Co. 2001).



The legislative history behind subsection (c) does not help the dissent either. I agree with the dissent that the legislative history to the 1991 Amendment is not lengthy. But that is perhaps because Congress had a single-minded purpose:

> This section amends 42 U.S.C. § 1981 (commonly referred to as "Section 1981") to overturn *Patterson v. McLean Credit Union* and to codify *Runyon v. McCrary*, 427 U.S. 160 (1976).
>
> . . . .
>
> Subsection (c) – Prohibiting discrimination in private contracting. – This subsection is intended to codify *Runyon v. McCrary*. In *Runyon*, the Court held that Section 1981 prohibited intentional racial discrimination in private, as well as public, contracting. *The Committee intends to prohibit racial discrimination in all contracts,* both public and private.

H.R. Rep. No. 102-40(II), at 37 (1991) (emphasis added).

Congress's intent in enacting subsection (c) could not have been any clearer: it intended to prohibit racial discrimination "in all contracts," but only contracts, *because that is all it wrote*.[6] Yet, the dissent thinks that Congress's failure to

[6] This amendment was in direct response to the Supreme Court's opinion in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989). *Patterson* held that § 1981 prohibited discrimination only in the making and enforcement of contracts, and did not extend to problems arising from conditions of continuing employment. In the Civil Rights Act of 1991, Congress explicitly reversed this aspect of *Patterson* by adding subsection (b) to § 1981, which states that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of